**GEER et ux. v. BIRMINGHAM.**
Civ. No. 423.

United States District Court
N. D. Iowa, C. D.
Jan. 10, 1950.

Thomas B. Roberts and Charles Harris (of Brammer, Brody, Charlton, Parker & Roberts), of Des Moines, Iowa, and Christopher T. Boland, of Washington, D. C., for the plaintiffs.

Tobias E. Diamond, United States District Attorney, of Sioux City, Iowa, and George R. Parsons, Special Assistant to the Attorney General, for the defendant.

GRAVEN, District Judge.

An action by the plaintiffs under Section 1340 of the Revised Judicial Code, 28 U.S.C.A. § 1340, to recover from the defendant Collector taxes claimed to have been illegally and erroneously collected. The question involved is whether the receipts of a ballroom operated by the plaintiffs are subject to the so-called "cabaret tax." Section 1700(a) (1) of the Internal Revenue Code, 26 U.S.C.A. § 1700(a) (1), provides for a tax on, "the amount paid for admission to any place, including admission by season ticket or subscription." Section 1650 of the Internal Revenue Code, 26 U.S.C.A. § 1650, fixes the rate of this "admissions tax" at 1 cent for each 5 cents or major fraction thereof paid within the terms of Section 1700(a) (1), supra. Section 1700(e) of the Internal Revenue Code, 26 U.S.C.A. § 1700(e), provides for a tax on, "all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance. No tax shall be applicable under subsection (a) (1) on account of an amount paid with respect to which tax is imposed under this subsection." Section 1650 of the Code, supra, fixes the rate of the tax under Section 1700(e) at 20 per cent.

It is the claim of the defendant Collector that under the provisions of said Section 1700(e), supra,. the plaintiffs are subject to the so-called "cabaret tax" of 20 per cent on the receipts from their ballroom. The plaintiffs contend that the establishment operated by them does not come within the provisions of said Section 1700(e), but rather should be taxed under the terms of Section 1700(a) (1), supra.

The particular tax payment which the plaintiffs seek to recover in this action is the sum of $44.90 paid by them to the defendant Collector on December 13, 1948, and based on the receipts from their ballroom for the evening of December 9, 1948. This tax was paid by the plaintiffs and was not collected by them from their patrons. The plaintiffs filed proper claim for refund of the tax in question on December 13, 1948. On March 23, 1949, the Commissioner of Internal Revenue notified the plaintiffs that their claim for refund had been disallowed. The grounds set forth in the claim for refund are the same as those relied upon in this action. Since the tax on admission charges to the plaintiffs' ballroom is approximately the same under the "admission tax" imposed by Section 1700 (a) (1) as under the so-called "cabaret tax" imposed by Section 1700(e), i. e., 20 per cent, the main controversy in this case has to do with the application of the so-called "cabaret tax" under Section 1700(e) to those receipts of the plaintiffs' ballroom derived from the operation of a checkroom, rental of booths, and the sale of refreshments and merchandise. So far as these particular plaintiffs are concerned the question of their tax liability or of their securing tax refunds in the amount of several thousand dollars is dependent upon the final determination of the validity or invalidity of their claim for refund in this case since plaintiffs have continued since December, 1948, to pay the tax demanded by the Collector under Section 1700(e) of the Internal Revenue Code, supra. There is also, under Section 1700(e), potential liability of the plaintiffs for taxes on similar receipts prior to December 9, 1948.

The plaintiffs are a partnership composed of husband and wife and have since 1938 operated the Laramar Ballroom at Fort Dodge, Iowa. The ballroom is operated in portions of two adjacent buildings leased by the plaintiffs. There has been no substantial change in the space in which the plaintiffs operate their ballroom or in the manner in which it has been operated during the past ten years. One of the two buildings leased by the plaintiffs, known as the Armory Building, houses the major portion of the space occupied by the plaintiffs' ballroom. It is also used by local units of the National Guard. In the building known as the Armory Building the space leased by the plaintiffs consists of a part of the basement, part of the first floor and that portion of the second floor consisting of a balcony. In the basement is located the plaintiffs' business office, a checkroom, a fountain counter, rest rooms, and three wooden benches seating 15 persons. The first floor space consists of a dance floor 58 feet by 100 feet; a lounge with a seating capacity of 43 people, and a small lobby in which is located a box office where tickets for admission to the ballroom are sold. The balcony located on the second floor overlooking the dance floor is approximately 8 feet wide and extends around the entire dance floor at a height of 10 feet. In this balcony there is a fountain counter and also 38 booths seating 152 people. The space leased by the plaintiffs in the adjacent building consists of a room 20 feet by 70 feet connected with the dance floor by two entrances. In this space there is another fountain counter and also 35 booths seating 140 people, but there is no area for dancing. On certain nights 32 additional seats are usually provided ballroom patrons by the placing of 32 steel folding chairs around the edge of the dance floor. The total seating capacity of the ballroom, including the lounge, the space in the adjacent building, and the balcony, but excluding the 32 folding chairs, is about 350 people. The dance floor itself can accommodate 2000 people. The ratio of seating capacity to dance floor capacity is thus 17½ per cent.

During all the time the Laramar Ballroom has been operated by the plaintiffs, admission to the ballroom could only be

obtained by the purchase of a ticket at the box office located in the lobby just inside the street entrance and the presentation of such ticket to a ticket taker stationed at the door connecting the lobby with the dance floor. The purchase of an admission ticket entitled the purchaser to dance the entire evening without further charge. Such admission ticket also entitled the purchaser to use the seats in the lounge and the seats in the room in the adjacent building without further charge. The purchaser of an admission ticket could rent one of the booths in the balcony for 60 cents per evening, or could use one of those booths without additional charge until it was rented to another patron. In the year 1948 the total receipts from booth rentals amounted to approximately one-half of one per cent of the total receipts of the ballroom.

The plaintiffs held dances in their ballroom regularly on Thursday, Saturday, and Sunday nights starting in September and ending in May of each year. They also held dances there on those national holidays not falling on one of the regular operating days just noted. Dance bands or orchestras of local and national reputation furnished music for the dances. Entertainment distinct and different from the dance music itself has not been provided at any time. The plaintiff Larry V. Geer testified that he knew of no instance in connection with the operation of the Laramar Ballroom where a patron purchased an admission ticket and did not avail himself of the dancing privileges. During the period each year from May to September the plaintiffs operate a so-called "summer ballroom" at a location other than that occupied by the Laramar Ballroom. The taxability of the receipts from the operation of this "summer ballroom" is not at issue in this case.

On dance nights the music for the dancing begins at 8:30 P.M. and ends at 12:30 A.M. of the following day with two 10 minute intermissions for the orchestra during the evening. Except for those intermissions and for the time taken by the members of the orchestra to turn their music, the dance music is continuous. The members of the dance orchestra do not leave the orchestra platform except during the intermissions. The ballroom is open approximately 30 minutes before the dance music starts, and the ballroom is closed as soon after the music stops at the patrons can get their wraps and leave.

The regular established admission charge to the plaintiffs' ballroom was 55 cents for Thursday nights prior to 9:00 P.M. and 65 cents after that hour; 65 cents for Saturday nights and 75 cents for Sunday nights. These prices include the Federal admission tax under Section 1700(a) (1) of the Internal Revenue Code, supra.

The plaintiffs, from the time the ballroom opens on dance nights and until the dance music ends, have available for sale to their patrons soft drinks, peanuts, popcorn, candy, gum and cigarettes. Waitresses are available from whom these items may be ordered by patrons seated at any booth. Patrons may also purchase these items at any of the three fountain counters. Cigarettes are sold for 21 cents per pack, soft drinks at 10 cents per bottle, popcorn for 10 cents, peanuts for 5 cents per bag, candy bars for 5 cents, and gum for 5 cents. With the exception of cigarettes, which for a time were sold at 20 cents per pack, the prices charged for these refreshments and merchandise have remained constant. The prices charged for these items in the plaintiffs' ballroom are the prices usually and normally charged for such items at other retail outlets. The purchase of any of these items is entirely optional with the patron and the dancing privileges of a patron are neither added to nor subtracted from by his purchase or failure to purchase any of these items. The patrons are not permitted to purchase these items after the dance music is over for the evening. There are no menus provided in connection with the sale of these items, and no meals or sandwiches are served by the plaintiffs at any time. There are no facilities for cooking in the plaintiffs' ballroom, and they have neither silverware nor table linen. The only dishes used in the ballroom are water glasses and popcorn bowls. In the operation of their establishment the plaintiffs always represented and advertised it as a ballroom or dance hall with dancing as

the sole entertainment. They never represented or advertised it as a place where meals or other food was dispensed. During the year 1948 the average amount spent by a patron for the items of refreshment and merchandise referred to was 27 cents. Since 1939 a checkroom has been provided for those patrons who wish to check their wraps. A 10 cent charge is made for this service. The checking of wraps is entirely optional with the patrons. The checkroom is operated by plaintiffs' employees who are employed on a salary basis. The plaintiffs frequently rent their ballroom to organizations for dancing or convention purposes. During the year 1948 the rentals derived therefrom amounted to less than 1 per cent of the total gross receipts of plaintiffs' ballroom.

For the year 1948 the receipts from the sale of admission tickets to the ballroom constituted approximately 67 per cent of the gross income therefrom, receipts from the sale of the refreshments constituted approximately 27 per cent therefrom, and receipts from the checkroom constituted approximately 6 per cent therefrom. The word "approximately" is used because a fractional percentage of the gross receipts was derived from rental of the ballroom to other organizations, and from the rental of booths.

It is the claim of the plaintiffs that the ballroom operated by them did not and does not come within the provisions of said Section 1700(e) imposing a tax on the receipts of cabarets or other similar places. It is the contention of the plaintiffs that Congress in enacting that Section used the word "cabaret" in its ordinary and usually-understood sense and that in its ordinary and usually-understood sense the term "cabaret" does not include a ballroom such as is operated by the plaintiffs.

The word "cabaret" is a French word of unknown origin which has been in use in English-speaking countries since at least the 17th Century. See, The Oxford English Dictionary (Second Edition). In Webster's New International Dictionary (Second Edition) the word is defined as, "A cafe or restaurant where patrons are entertained by performers who dance and sing after the practice of certain French taverns." In the Universal Dictionary of the English Language the word is defined as, "Small drinking place or night restaurant in which singing or dancing performances are given." In a Dictionary of American-English the word cabaret is defined as, "A restaurant which provides entertainment by singers, dancers, etc." In Webster's New International Dictionary (Second Edition) the term "roof garden" is defined as follows: "A garden on a flat roof of a building: esp., a garden where refreshments are served, on the roof of a high building, often with a stage for entertainment." From the legislative history of the statute in question hereinafter given it appears that Congress made use of the term "roof garden" to define the word "cabaret" more precisely.

The plaintiffs presented a large amount of oral and documentary evidence as to the ordinary, popular, general and well-known signification given to the word "cabaret" as contrasted with the word "ballroom" and the distinction between the types of establishments characterized by the use of the word "cabaret" and the word "ballroom." One of the witnesses as to this phase of the case was the District Manager for the States of Iowa, Kansas, and Nebraska for the American Society of Composers, Authors and Publishers. Another witness was the traveling representative of the American Federation of Musicians whose territory included ten Midwestern States. Another witness was in charge of orchestra bookings in eleven Midwestern and Western States. Another witness was the Chicago representative of "Billboard," an amusement trade periodical of national circulation. The plaintiff, Larry V. Geer, who was the past president of the Midwestern Ballroom Operators' Association, and its successor, the National Ballroom Operators' Association, and who is at the present time chairman of the Board of Directors of the latter organization, was another witness. Quite a number of witnesses who either had operated ballrooms and were operating or were connected with operating ballrooms in Iowa and a number of other States testi-

fied as to this phase of the case. Some of the documentary evidence offered on this phase of the case consisted of menus from cabarets containing price lists and material showing the nature and kind of entertainment furnished by cabarets. The witnesses referred to were thoroughly familiar with the operation of ballrooms and cabarets locally, sectionally and nationally. The defendant Collector offered no evidence contradicting or disputing their testimony. The defendant Collector, however, did and does vigorously dispute the relevancy and materiality of their testimony.

It appears from the testimony of those witnesses that in the amusement trade the term "night club" is customarily and ordinarily used as a synonym for "cabaret." In their testimony the witnesses used those words interchangeably. In one of the more recent dictionaries, The New Dictionary (1947), the word "cabaret" is defined as, "A night club featuring entertainment by singers and dancers."

It clearly appears that a ballroom and a cabaret have many different characteristics. A ballroom has a large dance floor generally running from 1500 to 5000 square feet. A cabaret has a small dance floor. The District Manager for the American Society of Composers, Authors and Publishers testified that the largest cabaret dance floor in his territory was about 15 feet by 30 feet and that they averaged 15 feet by 15 feet. In a ballroom the dancing space is large in comparison to the rest of the space in the establishment while in cabarets the dancing space is small in comparison to the rest of the space in the establishment. A cabaret provides seating for all of its patrons and only admits those it can seat whereas a ballroom provides seating for only a rather small number of its patrons, generally not exceeding 20 per cent. A cabaret has entertainment separate and distinct from the dance orchestra music. Such entertainment is generally referred to as a floor show. These floor shows are of many kinds and variations and are subdivided into what are usually referred to as acts. The staging and handling of floor shows in a cabaret would seem to correspond somewhat to the type of entertainment provided in the world of the theatre. Except of infrequent occasions a ballroom provides no entertainment separate and distinct from the dance music. The plaintiffs in the operation of their ballroom have not furnished and are not furnishing entertainment separate and distinct from dance music. A ballroom has a box office where patrons purchase a ticket of admission, and no patrons are admitted without such ticket. Cabarets do not maintain box offices and do not sell tickets for admission. The prices charged by ballrooms for drinks, candy, popcorn, peanuts and gum are comparable to those charged in ordinary retail outlets. The prices charged by cabarets for food and drinks are greatly in excess of those charged by ordinary establishments vending food and drinks. Some menus were introduced into evidence giving among other prices the prices charged by certain cabarets for soft drinks similar to those sold by the plaintiffs. The prices at those cabarets for soft drinks were from 50 cents to 80 cents a bottle as compared with the price of 10 cents a bottle charged by the plaintiffs. The average expenditure per patron for an evening at a ballroom ranges from $1.00 to $1.68 per person. There was testimony to the effect that the expenditure for one person for an evening at a cabaret would not be less than $5.00 and in a good many cases not less than $10.00. Ballrooms generally open from around 7:30 P.M. to 9:00 P.M. and generally close at from 12:30 A.M. to 1:30 A.M. A great many of the ballrooms close at 12:30 A.M. Cabarets usually open in the late afternoon and usually stay open several hours longer than do ballrooms. In some cases cabarets stay open until 4:00 A.M. and at times until 5:30 A.M. or 6:00 A.M. In ballrooms the dance music is usually continuous for a four-hour period except for one or two short intermissions. The total period of such intermission or intermissions is usually from 15 to 20 minutes. In cabarets the music for dancing is intermittent with fairly long and regular intermissions. An orchestra furnishing music for a cabaret is frequently on duty for six or seven hours per evening as contrasted with four hours per evening for orchestras

furnishing music for ballrooms. It was testified to that there is some variation in the type and kind of orchestras used in ballrooms and in cabarets and that ballrooms tended to make more use of the larger and so-called "name" dance bands than do the cabarets, although some orchestras or dance bands do play in both. The receipts of a cabaret are to a large extent derived from the proceeds of the sale of food and drink. The greater part of the receipts of a ballroom are derived from the sale of admission tickets for dancing privileges. It was testified that it is not general or usual for a person to buy an admission ticket to a ballroom and not dance and that the primary purpose of those attending ballrooms is to dance. It was testified that only a very small percentage of cabaret patrons do make use of the dancing privileges afforded. It was further testified that cabaret patrons usually and generally patronized such establishments for purposes other than dancing and that such purposes were to see the floor show, to entertain guests, and to partake of food and drink. Ballrooms are classified as distinct from cabarets by the American Federation of Musicians and by the American Society of Composers, Authors and Publishers. Operators of cabarets are not eligible for membership in the National Ballroom Operators' Association. In the amusement trade periodical, "Billboard," ballrooms and cabarets are dealt with and covered in separate sections. A representative of that periodical testified that they were so separated because operators of cabarets were not interested in items pertaining to ballrooms and the operators of ballrooms were not interested in items pertaining to cabarets.

It appears that ballrooms throughout the country do in general follow a fairly uniform pattern in their mode and manner of operation and that such pattern has been followed for a fairly long period of time. The plaintiffs in the operation of their ballroom have in general followed that pattern. There are some variations among ballrooms as to the number of nights they operate and a minor variation in the hours of opening and closing. Some ballrooms make a charge for checkroom service; others do not. Some ballrooms make a charge for booths; others do not. Some ballrooms serve beer and a few serve beverages of a higher alcoholic content. The plaintiffs in the operation of their ballroom served neither.

The Internal Revenue Code has to do with a multitude of situations. Its provisions are of the greatest importance to the Government from the standpoint of revenue, and such provisions have been most carefully drafted. See, 35 American Bar Association Journal, December, 1949, p. 1002. Notwithstanding the carefulness of its draftsmanship, the intricate nature of the Internal Revenue Code has given rise to many questions of interpretation. The large number of cases having to do with the interpretation of the Internal Revenue Code and the large number of administrative rulings and regulations having to do with the interpretation of its provisions make it manifest that in few fields of law does the matter of interpretation have such a peculiar and important significance as it does in the field of law relating to that Code. Legislative history and administrative background are important aids in the interpretation of statutory provisions. The United States Supreme Court has clearly and emphatically stated the importance of legislative history in questions arising under the provisions of the Internal Revenue Code. In the case of Harrison, Collector v. Northern Trust Company, 1943, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407, a case arising under a provision of the Internal Revenue Code, that Court held that it was reversible error for the lower Court to refuse to give consideration to the legislative history of the provision involved even though the provision was on its face apparently plain and unambiguous.

It would seem necessary to examine in some detail the legislative history and administrative background of the particular provisions of the Internal Revenue Code under consideration in the present case.

The history of Section 1700 of the Internal Revenue Code, 26 U.S.C.A. § 1700,

began in the year 1917 when for the first time Congress imposed a tax in the nature of an admissions tax upon entertainments of various kinds. The House Report on H.R. 4280, which became the Revenue Act of 1917, 40 Stat. 300, stated: "It is recommended that this tax be imposed upon all places to which admission is charged, such as motion picture shows, theatres, circuses, entertainments, cabarets, ball games, athletic games, etc." H.R. Report No. 45, 65th Cong., 1st Sess., 1917, 8.

The difficulty of imposing this "admissions tax" upon a category of entertainment in existence at that time known as "cabarets," which usually made no admissions charge as such but rather included the price of admission in the amounts charged for refreshments, service, or merchandise afforded the patrons was clearly presented to the Senate Committee on Finance when it was conducting hearings on H.R. 4280 (the Revenue Bill of 1917). Mr. Ligon Johnson, representing The Theatrical Managers' Association, stated in Hearings and Briefs before the Committee on Finance, United States Senate, 65th Cong., 1st Sess. at p. 385:

"* * * The other point that I raise with relation to amusement taxes applies to the theaters' chief competitor, and the single interest that has done more to detract from the theatrical patronage than anything else in the United States; that is, the cabaret. The House Committee contemplated a tax on cabarets, as it says in its report: 'It is recommended that this tax be imposed on all places to which admission is charged, such as motion-picture shows, theaters, circuses, cabarets,' and so on.

"The trouble is that to the cabaret no admission fee is directly charged. That the cabaret is a public performance for profit is no longer an open question. The Supreme Court of the United States last January settled that in specific terms. I quote from the decision of that court in the case of Herbert v. Shanley [242 U.S. 591, 37 S.Ct. 232, 233, 61 L.Ed. 513]: 'The defendant's performances are not eleemosynary—they are part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order is not important. * * * If the performance did not pay, it would be given up. If it pays, it pays out of the public's pocket. Whether it pays or not the purpose of employing it is profit.'

"As all of us who have attended cabarets know, there is a uniform increase in price in the food, drinks and merchandise sold. In many instances the bar price of a drink will be 15 cents, and in the cabaret hall it will be as high as 50 or 60 cents for the same thing. Certainly, it would not be worth the 50 or 60 cents to carry it up one flight of stairs. So that in all instances where a public performance of this character is given the public pays an admission price, although as Justice Holmes said, it may be disguised in the price of the article sold. We would suggest that it would not be difficult to draft an amendment to bring public performances for profit under the bill."

The Senate Committee on Finance seemed to be in general accord with the imposition of the admissions tax on entertainments as recommended in House Report No. 45, supra, but apparently as a result of its hearings the Senate Committee on Finance recommended the following changes in the House version of the Revenue Bill of 1917:

"Your committee recommended the following amendments to Title VII of the House bill:

"First. Where admissions charged are in part or wholly included in the price paid for refreshments, service, or merchandise, the amount paid for such admission is to be computed under rules prescribed by the Commissioner of Internal Revenue, and a tax is proposed at the rate of 1 cent for each 10 cents paid for such refreshments, etc.

"The purpose of this amendment is to impose a tax upon admissions to *what are commonly known as cabarets* at the same rate as is imposed upon admissions to similar entertainments or amusements. It has been held by the courts that where extra charges were made for refresh-

ments, service, and merchandise in places of amusement this extra charge constituted as admission charge. Adopting the principle of this decision, your committee has made the additional price paid for these things the basis of the tax for admission to such places." Senate Report No. 103, 65th Cong., 1st Sess., August 4, 1917, 12. (Italics supplied).

Both houses of Congress subsequently agreed to this Senate recommendation in the conference report contained in H.R. Report No. 172, 65th Cong., 1st Sess., September 29, 1917, 17, 44, and the Revenue Act of 1917 as enacted provided in part for:

"Section 700. * * * (a) a tax of 1 cent for each 10 cents or fraction thereof of the amount paid for admission to any place, including admission by season ticket or subscription, to be paid by the person paying for such admission * * *.

"(c) a tax of 1 cent for each 10 cents or fraction thereof paid for admission to any public performance for profit at any cabaret or other similar entertainment to which the charge for admission is wholly or in part included in the price paid for refreshment, service, or merchandise; the amount paid for such admission to be computed under rules prescribed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, such tax to be paid by the person paying for such refreshment, service, or merchandise." 40 Stat. 318.

Thus, from its inception, the admissions tax was imposed upon the general field of entertainment, which was further subdivided for purposes of the imposition of the tax into two different categories because of the nature of the entertainment subject to the tax. On the one hand was that form of entertainment to which a direct admission charge was made upon the patrons, as is the case with theaters, skating rinks or the like, and on the other hand that form of entertainment to which no admission charge as such was made but rather the charge for admission was included in whole or in part in the price paid by the patron for refreshment, serv-

ice or merchandise. "What are commonly known as cabarets" comprised this second category.

It should be kept in mind that this tax imposed by Section 700 of the Revenue Act of 1917, supra, was an admissions tax which had been enacted in two parts because of the peculiar nature of the operation of cabarets, which necessitated a different basis and computation of the admissions tax in their case. It seems apparent therefore that Section 700(c) of the Revenue Act of 1917 was intended to supplement Section 700(a) of the Revenue Act of 1917, which was the general admissions tax section, and was enacted to reach that portion of the charge imposed by a cabaret furnishing a public performance for profit which could fairly be attributed to an admissions charge, regardless of the form in which the charge was imposed. In accordance with the recommendations in Senate Report No. 103 and H.R. Report No. 172, both supra, and the authority contained in Section 700 of the Revenue Act of 1917, supra, the Commissioner of Internal Revenue promulgated T.D. 2603, announced December 4, 1917, which established a formula for the computation of the "admissions" tax in the case of any "cabaret or other similar entertainment." T.D. 2603 provided in part: "Twenty percent of the amount paid for refreshments, merchandise, service, etc., including any sum paid for seats and tables reserved or occupied, at any public performance for profit at any cabaret or other similar entertainment, to which the charge for admission is wholly or in part included in the amount so paid, shall be regarded and deemed to be paid for admission to such performance."

An explanation of this rule established by the Treasury Department in T.D. 2603 for determining what proportion of the total charge of a cabaret or other similar entertainment was attributable to the admission charge of such establishment as well as a recommendation that the tax be increased was included in H.R. Report No. 767, 65th Cong., 2d Sess., September 3, 1918, 32, which provided in part: "The revenue act of 1917 levied a tax of 1 cent

for each 10 cents or fraction thereof paid for admission to any public performance for profit at any cabaret or other similar entertainment and in case the amount charged for admission was included in the price paid for refreshment, service or merchandise, left the amount so included for admission to be determined by the commissioner. Under this provision the Treasury Department determined that a general rule could be laid down to the effect that 20 per cent of the amount paid for refreshment, service and merchandise represented approximately the amount covered by the total price paid which could be attributable to the admission charge, and upon the basis of this ruling collected the tax levied under existing law. A provision of the bill contains this Treasury ruling as a basis for determining the tax upon the admission where the admission charge is included in the price for refreshments. The tax upon admission to roof gardens, cabarets, and other similar entertainments is increased from 1 cent for each 10 cents or fraction thereof to 2 cents for each 10 cents or fraction thereof of the amount paid."

The interchangeable use of the term "roof gardens" with the word "cabaret" in that portion of the House Report quoted above was apparently an attempt to delimit more precisely the term cabaret, and there is no indication that it was meant to alter or amend the legislative intent behind the Revenue Act of 1917.

The term "roof gardens" as used in H.R. Report No. 767, supra, as well as the formula established in T.D. 2603, supra, were subsequently adopted in the Revenue Act of 1918, 40 Stat. 1057, but the rate of tax on admissions to any public performance for profit at any roof garden, cabaret, or other similar entertainment was not increased to the extent recommended in H.R. Report No. 767, supra. Section 800(a) (1) of the Revenue Act of 1918 taxing admissions generally, as well as Section 800(a) (6) taxing admissions to roof gardens, cabarets, or other similar entertainments, appear in 40 Stat. 1120, 1121, as follows:

"(1)  A tax of 1 cent for each 10 cents or fraction thereof of the amount paid for admission to any place * * *.

"(6)  A tax of 1½ cents for each 10 cents or fraction thereof of the amount paid for admission to any public performance for profit at any roof garden, cabaret, or other similar entertainment, to which the charge for admission is wholly or in part included in the price paid for refreshment, service, or merchandise; the amount paid for such admission to be deemed to be 20 per centum of the amount paid for refreshment, service, and merchandise; such tax to be paid by the person paying for such refreshment, service, or merchandise."

The pertinent provisions of the 1918 Act remained unchanged in the Revenue Act of 1921, 42 Stat. 227, except that admission tickets of 10 cents or less were exempt from tax under Section 800(a) (1).  See Section 800, 42 Stat. 289, 290.

The Revenue Act of 1924 added the following sentence to both Section 500(a) (1) taxing admissions to any place, and to Section 500(a) (5) taxing admissions to any public performance for profit at any roof garden, cabaret or other similar entertainment: "Where the amount paid for admission is 50 cents or less, no tax shall be imposed."  43 Stat. 320, 321.

The Revenue Act of 1926 made no change in the pertinent provisions of the 1924 Act, except that admission tickets of 75 cents or less were exempt from tax under Section 500(a) (1).  See Section 500, 44 Stat. 91, 92.

The first Treasury Regulations on the subject were adopted in 1918.  Treasury Regulations 43, 1918 Ed.  The Regulations were continued in subsequent years. Treasury Regulations 43, 1919 Ed., Part 1; 1921 Ed., Part 1; 1922 Ed., Part 1; 1924 Ed., Part 1.

In 1926 that portion of Treasury Regulations 43 applicable to the tax on admissions to any public performance for profit at any roof garden, cabaret, or other similar entertainment provided as follows:

"Art. 8.  Basis, rate, and computation of tax.—The tax imposed under the above

provisions of the act applies to amounts paid for admission to any public performance for profit at any roof garden, cabaret, or similar entertainment, to which the charge for admission is wholly, or in part, included in the price paid for refreshment, service, or merchandise. If the admission charge, either in whole or in part, is so included, 20 per centum of the total amount paid for refreshment, service, or merchandise is deemed to be paid for admission, and if in excess of 50 cents will be subject to the tax at the rate of 1½ cents for each 10 cents or fraction thereof.

"If a fixed admission charge is imposed and it is fair and reasonable in comparison with charges made for similar performances or entertainments under different circumstances, such charge is taxable under paragraph (1) of section 500 of the Act and the tax imposed under paragraph (5) above would not apply to amounts paid for refreshment, service, or merchandise. If such admission charge is inadequate to cover the cost of the entertainment provided, 20 per cent of the charge for refreshment, service, or merchandise is taxable under paragraph (5). Where a specific, and apparently adequate, admission charge is made but the prices charged for refreshment, service, or merchandise during the entertainment are higher than at other times, the tax under paragraph (5) will apply to the amount paid for refreshment, etc.

"The fact that tax is paid on the admission charge proper under paragraph (1) will not operate to reduce or abate the tax due on the price paid for refreshment, service, or merchandise. Twenty per cent of the amount paid for the latter will be deemed to represent a charge for admission notwithstanding the payment of the specific but inadequate admission charge.

"It should be noted that the tax attaches where the entire amount paid for food, service, and merchandise exceeds $2.50 even though expended on behalf of more than one person; therefore, where a party of six persons is presented with a bill amounting to $12 the amount of tax will be 36 cents.

"The rate of this tax is different from that imposed on admissions proper under paragraph (1). However, it is not a flat 3 per cent tax, but is at the rate of 1½ cents for each 10 cents or fraction thereof of the proportion (20 per cent) of the price paid for refreshment, service, or merchandise, which represents the charge for admission. In practice it is found more convenient to compute the tax on the basis of 1½ cents for each 50 cents or fraction thereof of the total amount paid for refreshment, service, or merchandise in connection with public performances or entertainments at roof gardens, cabarets, etc. The process is simpler and the result is always the same.

"*Examples.*—(1) A certain person invites four of his friends to attend a cabaret. No fixed charge is made for admission. His check for refreshments for the party amounts to $15.87. As 50 cents is contained in $15.87 thirty-one and a fraction times, the tax in this case is 48 cents (32 times 1½ cents).

"(2) A certain person reserves a table for himself and three friends at a roof-garden entertainment and pays $12 for the reservation, this being the regular price. This being a charge for admission, and apparently being adequate, there is no tax in this case under these provision[s] of the Act, but a tax of $1.20 is imposed by section 500(a) (1) of the Act.

"(3) A certain restaurant conducts a cabaret in its main dining room every evening from 8 to 12 o'clock. In this case a person who takes dinner in that dining room and leaves the room before 8 o'clock and who therefore does not witness the cabaret at all is not subject to any tax under these provisions of the Act.

"(4) In this same restaurant there are other dining rooms so entirely separate from the main dining room that from them nothing that is going on in the main dining room can be either seen or heard. No cabaret performance or other entertainment is furnished in these other rooms. In this case no person dining in one of these other rooms, even during the time that the cabaret performance is going on

in the main dining room, is subject to any tax under these provisions of the Act.

"(5) A hotel, running a cabaret, requires every person entering to purchase a $1 food check. This check is later accepted as $1 in payment of the food and other refreshments consumed. A certain person purchases such a check for $1 and spends an evening at the cabaret. His bill at the end of the evening comes to $8.33, and he pays it by handing in the check and paying $7.33 in cash. The $1 so paid for this check is not 'paid for admission' within the meaning of the Act. The tax in this case is [b]ased on the $8.33 spent, and is 26 cents (17 times 1½ cents).

"(6) A certain man goes to a cabaret where there is a general admission charge of 80 cents. The entertainment provided is very elaborate, and this is reflected in the price of the food. His bill for food comes to $12.37. In this case there is an admission tax of 8 cents, due under Article 1, on the 80 cents paid on admission. But as this amount is clearly inadequate there is also a tax of 38 cents (25 times 1½ cents), based on the amount paid for food.

"Art. 9. Entertainments included.— 'Any public performance for profit at any roof garden, cabaret, or other similar entertainment' includes every public vaudeville or other performance or diversion in the way of acting, singing, declamation, or dancing, either with or without instrumental or other music, conducted for the profit of the management by professionals, amateurs, or patrons under the auspices of the management, in connection with the service of selling of food or other refreshment or merchandise at any room in any hotel, restaurant, hall, or other public place. Every form of entertainment so conducted is included, except instrumental music unaccompanied by any other form of entertainment.

"Examples.—(1) A proprietor of a dancing establishment provides for the serving of refreshments to his patrons. *No charge is made for 'admission' or for dancing.* In this case the management is conducting an entertainment the admission charge to which is wholly included in the price paid for refreshments, and there will be a tax

under these provisions of the Act." (Italics supplied).

"(2) A certain hotel provides a space in its dining room for dancing and charges $1.00 admission to everyone entering the room. The prices charged for food are not increased to cover the cost of the entertainment furnished. In this case the amount paid for admission is not included in the price paid for refreshment but is this separate $1.00 charge. This charge, therefore, is taxable as an 'amount paid for admission' under section 500(a) (1) of the Act and the tax is 10 cents. (See Art. 1.)

"(3) A certain other hotel maintains in its lobby a dancing floor surrounded by tables and serves refreshments to its patrons during the dancing hours. No charge is made for dancing. This is a case of a public performance for profit where the amount paid for admission is wholly included in the amount paid for refreshment and there will be a tax, therefore, under these provisions of the Act.

"(4) A certain other hotel conducts in a room adjoining its dining room, during tea time and in the evening, an entertainment in the form of dancing for its patrons. No charge is made to those desiring to dance. This case, as the one mentioned in the preceding example, is a case where the amount paid for admission to a public performance for profit is wholly included in the amount paid for refreshment, and there will, therefore, be a tax under these provisions of the Act.

"(5) A certain college alumni association gives a dinner to its members and invited guests, at a fixed charge per plate, at a certain hotel. Entertainers supplied by the hotel perform, and the diners themselves dance in an open space provided in the room. In this case, as the dinner is private, there is no tax, whether the cost of the cabaret performance is included in the charges per plate or is paid for in a lump sum by the alumni association.

"(6) A certain chamber of commerce gives a dinner, in honor of a distinguished man, at $5 a plate. Tickets are sold to anybody desiring to attend. Entertainment is furnished by performers supplied by the

hotel where the dinner is served. In this case, as the entertainment is supplied by the hotel, it is clearly for profit, and as the affair is also public there is a tax under these provisions of the Act. This tax applies to each individual payment made for a dinner ticket and is 15 cents (10 times 1½ cents) in each case.

"(7) A certain social club gives a dance at a hotel, charging $2 a ticket to both men and women. During an intermission in the dancing a light buffet supper is served. In this case the $2 is clearly paid for admission, and there is a tax of 20 cents under section 500(a) (1) of the Act (see Art. 1)." The Federal Tax Service (1926) from the records of the Corporation Trust Co., Part 2 (War Taxes) Chapter Three, pp. 1332–1334.

It clearly appears from these 1926 Regulations that the Treasury Department had the same intent as did Congress in regard to the taxing of roof gardens, cabarets, or other similar entertainments, i. e., to insure that such types of entertainment would pay an admissions tax upon what would be a fair and reasonable admission in comparison with the other charges they imposed, whether such amount was charged to their patrons as an ordinary admission or was disguised in the prices patrons had to pay for refreshment, service or merchandise. Thus, under the provisions of Section 500(a) (1) and Section 500(a) (5) of the Revenue Act of 1926, supra, and the corresponding Treasury Regulations, set out above, as the prices charged for admissions, refreshment, service or merchandise were increased by the operator or proprietor of any roof garden, cabaret or other similar entertainment the tax upon such charges was increased accordingly, just as would be the case if a theater, an opera or the like increased the charges it made for admission.

It should be noted that under these 1926 Regulations the operator of a roof garden, cabaret or other similar entertainment furnishing a public performance for profit could pay an admissions tax under Section 500(a) (1), the general admission tax section of the 1926 Revenue Act, on any direct admission charges imposed and also be subject to tax under Section 500(a) (5), the roof garden and cabaret tax section, for a tax on those charges he made for refreshment, service, or merchandise if the admission charge was considered inadequate or if the charges for refreshment, service or merchandise were increased during the period of the entertainment. This interpretation by the Treasury Department of Section 500(a) (5) of the Revenue Act of 1926 would appear to be in line with the indicated intent of Congress to impose an admissions tax upon that portion of the charges made by a roof garden, cabaret or other similar entertainment which could fairly be attributable to an admissions charge, regardless of the form in which the charges by such establishments were made. The Treasury Department as well as Congress apparently realized that there was a problem peculiar to roof gardens, cabarets, and the like which was not present in the case of the usual place of amusement imposing a direct admissions tax, such as a theater, skating rink, opera and the like. As noted above, that problem arose because of the nature of the operation of roof gardens and cabarets which usually imposed no admission charge as such, or only an inadequate admission charge, or would increase the prices of refreshment, service or merchandise during the period of entertainment.

The amendments to Section 500 of the Revenue Act of 1926 imposed by Section 411 of the Revenue Act of 1928, 45 Stat. 863; Section 711 of the Revenue Act of 1932, 47 Stat. 271; Section 219 of the Revenue Act of 1933, 48 Stat. 209; Section 801 of the Revenue Act of 1936, 49 Stat. 1743, and Section 712 of the Revenue Act of 1938, 52 Stat. 573, effected only minor changes in Section 500(a) (1) of the Revenue Act of 1926, the general admissions tax section and did not purport to change the tax as imposed by Section 500(a) (5) of the Revenue Act of 1926 on any public performance for profit at any roof garden, cabaret, or other similar entertainment. Provisions of Revenue Acts subsequent to the year 1926 which did effect changes in Section 500(a) (5) of the 1926 Act are noted below.

Treasury Regulations 43 promulgated for the year 1926, set out above, remained the same in 1927, The Federal Tax Service, Corporation Trust Co., 1927, Pars. 6669–6687; and also in 1928, Standard Federal Tax Service, CCH (Loose Leaf Division of Corporation Trust Co.,) 1928, Pars. 1821, 1822. In 1930, Article 8 and Article 9 of Regulations 43 became Article 10 and Article 11 of Regulations 43. Example number 2 under Article 8 and examples numbered 2 and 7 under Article 9 of the 1926 Regulations, set out above, were omitted from Article 10 and Article 11 respectively of Treasury Regulations 43 in the year 1930. These were the only changes affected in Article 10 and Article 11 of said 1930 Regulations. Standard Federal Tax Service, CCH, 1930, pp. 2023–2025.

The difficulties encountered in taxing the various type charges imposed by the operators of roof gardens, cabarets and the like upon their patrons were again pointed up in 1934 and 1935 when two Bureau of Internal Revenue rulings were issued to clarify the method of computing the tax in the situation where the roof garden or cabaret imposed a "minimum charge" upon each of its patrons. These rulings were issued under Section 500(a) (1) and Section 500(a) (5) of the Revenue Act of 1926, as amended by the Revenue Acts of 1928 and 1932. S.T. 726, C.B. XIII–1, 1934, 431, provided:

"A ruling is requested relative to the proper method of computing the tax on admissions to dances, cabarets, etc., where there is a minimum charge per person and food and/or beverages may or may not be ordered by the patrons to the amount of the minimum charge.

"* * * Where a minimum charge is made for each person admitted to a particular place, the amount of such charge is an admission charge within the meaning of section 500(a)1 of the Revenue Act of 1926, as amended, and is subject to the tax imposed by that section. If the menu prices at this place are higher at the time when dancing and entertainment are furnished, it is held that the charge for admission is included in the charge made for refresh-ments, service, or merchandise. In that event 20 per cent of such charge is taxable under section 500(a)5 of the Revenue Act of 1926, provided the entire amount of each bill less the minimum charge exceeds $2.50.

"Where a fixed and definite charge is made for admission, which charge includes the cost of dinner and dancing, the entire charge is an admission charge within the meaning of section 500(a)1 of the Revenue Act of 1926, as amended, and is subject to the tax imposed by that section."

S.T. 799, C.B. XIV–1, 1935, 420, modified S.T. 726, supra, as follows:

"Where a minimum charge for entertainment, and/or refreshment, service, or merchandise is made for each person admitted to a cabaret, etc., and each person is entitled to order refreshment, service, or merchandise totaling the minimum charge, such charge is not taxable under section 500(a)1 of the Revenue Act of 1926, as amended, as an amount paid for admission, but should be included in the total bill in computing the 'cabaret' tax under section 500(a)5 of the Revenue Act of 1926.

"S.T. 726 (C.B. XIII–1, 431) is modified accordingly."

These rulings apparently recognized the distinction between the ordinary admission charge of a theater, opera and the like, which only entitles the patron to gain admittance and to watch the performance, and the minimum charge imposed by a cabaret, which not only entitles the patron to remain in the establishment and permits him to watch the performance but also allows him to order refreshment, service, or merchandise up to the amount of the minimum charge without making further payments therefor. In line with this distinction S.T. 799, supra, provided that the minimum charge made by a cabaret should be taxed under Section 500(a) (5) of the Revenue Act of 1926 imposing a tax upon charges made by roof gardens, cabarets, and the like, rather than under Section 500(a) (1) of the 1926 Act which is the general admissions tax section. Since this practice of imposing a minimum charge upon its patrons appears to be one unique

to cabarets, the Bureau of Internal Revenue recognized the necessity of special rulings clarifying the taxability of such minimum charges.

The distinction between the method of imposing an ordinary admissions charge and the type of "admission charge" made by a cabaret or similar place was apparently recognized in T.D. 4749, C.B. 1937-2, 519, 520, approved July 14, 1937, which provided in part: " * * * All persons required to collect and account for tax on admissions must keep for possible inspection by revenue officers the portions of the tickets taken up by them, or in the case of a cabaret or similar place, the waiters' checks, for a period of not less than three months. For penalties imposed in this connection see article 56."

In 1938 Articles 10 and 11 of 1930 Treasury Regulations 43, supra, applicable to roof gardens, cabarets, or similar entertainments were incorporated in the Code of Federal Regulations under Title 26, Chapter I, Subpart D, Section 100.10 and Section 100.11, Code of Federal Regulations, 1938, pp. 822–825. Section 100.10 of these Regulations was similar to Article 10 of the 1930 Regulations but provided in addition that the "cover charge," which is unique to roof gardens, cabarets and the like, was actually an admission charge within the meaning of Section 500(a) (1) of the Revenue Act of 1926, as amended.

" * * * A 'cover charge' imposed upon each person admitted, or each person occupying a seat or table, is deemed to be an admission charge within the meaning of section 500(a) (1) as amended." CFR, 1938, p. 823.

Example number 5 of Article 8 of the 1926 Treasury Regulations, set out above, which had become example number 4 of Article 10 of the 1930 Regulations, was omitted from Section 100.10 of Title 26, Code of Federal Regulations, 1938, supra.

Section 101.13 of Title 26, Code of Federal Regulations, 1940 Supp., pp. 2352–2354, was substantially similar to the corresponding Section 100.10 of Title 26, Code of Federal Regulations, 1938, supra. However, Section 101.14 of Title 26, Code of Fed-

eral Regulations, 1940 Supp., differed from its corresponding Section 100.11 of Title 26, of the 1938 Regulations in that example number 6 of the 1926 Treasury Regulations 43, Article 9, set out above, which had been included in Section 100.11 of the 1938 Regulations as example number 5, was omitted from Section 101.14 of the 1940 Supplement to the Code of Federal Regulations and a new example was added: "(4) A hotel gives a New Year's Eve party in its dining room for which a charge of $5 per person is made to anyone desiring to attend. A dinner is served and entertainment in the form of music and dancing by the patrons is furnished. The charge of $5 represents an amount paid for refreshment, service, or merchandise, including admission, and is subject to tax of 20 cents."

In addition, example number 1 of Section 101.14 of the 1940 Regulations, which had been example number 1 of Article 8 of the 1926 Regulations 43, set out above, was changed in that the words, "and the tax applies," were substituted for the words previously used in the last sentence of said example number 1, "and there will be a tax under these provisions of the Act." This change would not appear to be of legal significance.

The provisions of Section 500(a) (1) and Section 500(a) (5) of the Revenue Act of 1926, as amended, imposing a tax upon admissions generally and upon amounts paid for admission, refreshment, service or merchandise to any public performance at any roof garden, cabaret or other similar entertainment, were incorporated in Section 1700(a) and Section 1700(e) respectively of the Internal Revenue Code of 1939.

The rather complex process of determining what proportion of the charges made by a roof garden, cabaret or other similar entertainment could be fairly attributable to an "admission charge" and then devising a method of taxing such "admission charge" had apparently proven to be so unsatisfactory that in 1941 Congress decided to change the method of computing the so-called "cabaret tax" under Section 1700(e) and the corresponding regulations. H.R. Report No. 1040, 77th Cong., 1st

Sess., July 24, 1941, 31, issued to accompany H.R. 5417, the Revenue Bill of 1941, contained a recommendation by the House Committee on Ways and Means for changing the basis of computing the "cabaret tax" in order to overcome "serious administrative difficulties."

"4. Changes in Basis of Computing Tax (Rates Increased in Certain Cases)

"In addition to the increases made by the bill in the rates of the existing excise taxes described under the preceding heading, certain other excise taxes undergo a change of base and, in some instances, an increase in rate as well, under the bill. These existing excises with respect of which a change of base only is made are * * *.

"Admission tax.—* * *

"Cabarets, roof gardens, etc.—Under the existing law, an attempt is made to segregate from the total charge made at cabarets, roof gardens, and similar places of entertainment, the portion attributable to a charge for admission, where such charge is wholly or in part included in the patron's bill. This method of taxation has entailed serious administrative difficulties.

"To obviate these difficulties, the bill makes the total charge the basis of the tax and applies to that base a rate of 5 per cent, in lieu of the existing rate of approximately 20 per cent of the portion of the bill attributable to an admission charge. Under existing law the tax is upon the patron but the owner of the establishment is charged with its collection and payment into the Treasury. The bill places the tax directly on the owner."

On p. 54 of the same report it was stated:

"Section 542. Cabaret, Roof Garden, etc., Tax. This section revises the base of the present 'cabaret' tax. It imposes a tax of 5 per cent on amounts paid for admission, refreshment, service, and merchandise at any roof garden, cabaret, or other similar place furnishing a public performance for profit. Liability for the tax is imposed on the proprietor. The tax applies to all amounts paid. Under present law the tax is imposed on the patron under a rather complicated rate of 2 cents (including the defense tax) for each 10 cents of 20 per cent of the amount paid if 20 per cent of the amount paid exceeds 50 cents.

"This section also makes certain amendments to administrative provisions of the Code applicable to the 'cabaret' tax and other admission taxes."

The "serious administrative difficulties" referred to in the House Report, set out above, apparently had reference to the unsuccessful attempts by the Treasury Department to exact the tax imposed by Section 1700(e) on hotel dining rooms wherein music and dancing were furnished in connection with the serving of food and no admission fee was imposed, either directly by a separate charge, or indirectly by including the charge for such music and dancing privileges in the price of the food.

In United States v. Broadmoor Hotel Co., D.C.Colo.1929, 30 F.2d 440, the defendant hotel furnished music for dancing in certain of its public rooms during portions of each day throughout the summer and twice weekly during the winter months. The defendant also served tea in various of its public rooms, imposing a charge of 75 cents upon each patron ordering tea whether such patron was in a room where the music and dancing were available or not. Apparently one did not have to be a guest of the hotel or buy tea in order to avail himself of the dancing privilleges, and no direct charge for dancing was imposed. The Treasury Department attempted to tax the defendant as a cabaret, roof garden or other similar entertainment furnishing a public performance for profit but was unsuccessful as the Court held that the music alone was not sufficient to bring the defendant within the category of a roof garden, cabaret, or other similar entertainment, and since 75 cents was not deemed to be an excessive charge for tea, the Court could find no admission charge or profit connected with this phase of defendant's business.

In another hotel case, Deshler Hotel Co. v. Busey, D.C.S.D.Ohio 1941, 36 F.Supp. 392, the Treasury Department was again unsuccessful in an attempt to tax a hotel dining room as a cabaret, roof garden or

other similar entertainment furnishing a public performance for profit. The plaintiff hotel in that case maintained and operated for the benefit and use of its guests and the public three dining rooms or restaurants, proceeds from the operation of one of which, the Ionian Room, was in question in the case. The plaintiff furnished dance music (along with vocal and instrumental soloists) during the dinner and late supper hours in its Ionian Room and at such times cleared a small space in front of the orchestra in order that patrons might dance. During the period involved there was no cover, minimum, door charges or special charges made upon persons entering the Ionian Room. The only charges made were for whatever food, service or refreshments such person chose to purchase, and the prices for food and alcoholic and non-alcoholic beverages remained substantially the same both during the times the music was playing and when it was not playing. The District Court found it unnecessary to pass upon the question of whether the Ionian Room was a roof garden, cabaret or other similar entertainment, since it concluded that there was no charge made for admission, either directly or included in the price of food, service or merchandise purchased, and there was no "direct profit" from the operation of such room, therefore, even though it concluded there was a "public performance," the requirements of Section 500(a) (5) of the Revenue Act of 1926, 26 U.S.C.A.Int. Rev. Acts, 1926, pp. 269, 272, had not been met.

As had been the case in United States v. Broadmoor Hotel Co., supra, the District Court in Deshler Hotel Co. v. Busey, supra, reached its decision in the face of Treasury Regulations which apparently covered the situations presented in those cases, and were contrary to the Courts' decisions therein. See Article 9 of the 1926 Treasury Regulations 43, set out above, and the corresponding provisions of subsequent regulations heretofore referred to.

In light of the above decisions, it is more readily understandable why Congress in 1941 decided to change the basis for computing the tax on any public perform-

ance for profit at any roof garden, cabaret or other similar entertainment. The Senate Committee on Finance in Senate Report No. 673, 77th Cong., 1st Sess., September 2, 1941, 19, 47, agreed to the change in the basis for computing the "cabaret tax" recommended by the House in H.R. Report No. 1040, supra. The Senate Committee in its report seemed primarily concerned with clarifying the right of the proprietor of a cabaret, roof garden or other similar entertainment to pass on to a patron the tax imposed by adding the amount of the tax to the patron's bill. The Senate Committee was of the impression that the House recommendation was legally permissible in this respect in that it merely shifted the legal incidence of the tax from the patron to the proprietor, making the proprietor primarily liable for the payment of the tax to the Government.

In accordance with the House and Senate Reports on the Revenue Bill of 1941, noted above, Section 542 of the Revenue Act of 1941, 26 U.S.C.A.Int.Rev.Acts, page 124, changed the basis for computing the "cabaret tax" as follows:

"(e) Tax on Cabarets, Roof Gardens, etc.—

"(1) Rate.—A tax equivalent to 5 per centum of all amounts paid for admission, refreshment, service, and merchandise, at any roof garden, carbaret [cabaret], or other similar place furnishing a public performance for profit, if any payment, or part thereof, for admission, refreshment, service, or merchandise, entitles the patron to be present during any portion of such performance. No tax shall be applicable under subsection (a) (1) on account of an amount paid with respect to which tax is imposed under this subsection.

"(2) By whom paid.—The tax imposed under paragraph (1) shall be returned and paid by the person receiving such payments."

Shortly after the Revenue Act of 1941 was approved, the Commissioner of Internal Revenue issued a memorandum letter, dated September 26, 1941, to the various Collectors of Internal Revenue and others concerned summarizing the changes effected by the Revenue Act of 1941 as re-

gards the tax under Section 1700(a) of the Internal Revenue Code on amounts paid for admission to any place and the tax under Section 1700(e) of the Internal Revenue Code on amounts charged at cabarets, roof gardens or other similar entertainments. This letter stated that:

"The Revenue Act of 1941, approved September 20, 1941, effected certain changes with respect to the taxes on admissions and dues, and it is believed desirable that appropriate information regarding these changes should be circulated at the earliest practicable moment to all persons in your districts who may be concerned with the collection of the taxes on admissions and dues or the taxes applicable to cabarets and similar places of amusement.

" * * * Section 1700(a)1 of the Internal Revenue Code is amended by section 541 of the Revenue Act of 1941 to make the present rate of tax on admissions applicable to the amount paid for admission to any place regardless of the amount of such admission charge, except that any admission charge of less than 10 cents made to a child under 12 years of age will be exempt from the tax.

" * * * Section 1700(e) of the Internal Revenue Code, under which a tax was imposed on amounts charged at cabarets, roof gardens, etc., has been amended in three important respects, namely, (a) the tax rate will be 5 per centum of the total amount paid for admission, refreshment, service, or merchandise, if the amount so paid, or any portion thereof, entitles the patron to be present during any portion of a performance at a roof garden, cabaret, or similar place furnishing a public performance for profit, (b) the provision exempting the admission charge if the amount paid was 50 cents or less (that is, if the amount paid for refreshment, service, or merchandise was under $2.50) has been eliminated, and (c) the tax is imposed upon, and shall be returned and paid by, the person receiving such payments. This tax is not required to be collected from the patron, as heretofore, but there is no objection to the cabaret, etc., passing it on to the patron if billed separately and in the exact amount. [Section 542 effected these changes].

"Since there are a number of motion picture theaters, skating rinks, dance halls, etc., the admissions to which were not taxable before October 1, 1941, but which will be taxable on that date and thereafter, appropriate information should be circulated to such theaters, skating rinks, dance halls, etc., at the earliest practicable moment; and they should be advised that all admission charges are subject to the tax except in the case of admissions of less than 10 cents charged to children under 12 years of age." Mim. 5255, C.B.1941–2, 260.

It is interesting to note that in the last paragraph of Mim. 5255, set out above, the Commissioner of Internal Revenue classified "dance halls" in the same category as motion picture theaters and skating rinks, apparently regarding all of these types of entertainment as imposing a general admission charge upon their patrons and thus falling within the terms of Section 1700(a) of the Internal Revenue Code imposing a tax upon amounts paid for admissions to any place rather than being within the terms of Section 1700(e) of the Internal Revenue Code taxing cabarets, roof gardens or other similar entertainments at a different rate and upon a different basis than the tax imposed by Section 1700(a) upon admissions generally. The classification of motion picture theaters, skating rinks, dance halls, etc., by the Commissioner in Mim. 5255, supra, becomes of increased importance in view of the fact that in this Revenue Act of 1941, for the first time since a tax upon these types of entertainment was imposed in 1917, that portion of the statute taxing cabarets, roof gardens or other similar entertainments no longer needed to be supplemented by that portion of the statute taxing admissions generally, inasmuch as Section 1700(e) (the "cabaret tax" section) now contained both a different rate and a different base than Section 1700(a) (the "admissions tax" section) and was designed to tax any charges imposed by a cabaret, roof garden or the like in whatever form such charges were

imposed. Thus, dating from the Revenue Act of 1941, Section 1700(e) was separate and distinct from Section 1700(a).

As a result of this statutory change in Section 1700(e) effected by Section 542 of the Revenue Act of 1941, supra, the Treasury Regulations interpreting such statute were also changed. Section 101.13 of Title 26, Code of Federal Regulations, 1941, Supp., entitled, "Basis, rate and computation of tax," was changed rather substantially from Section 101.13 of the 1940 Regulations and except for the rate of the tax and provisions relative to the various methods of passing the tax on to the patrons, was substantially similar to Section 101.13 of Title 26, Code of Federal Regulations, 1949 Ed. Section 101.13 as well as Section 101.2 of the 1941 Regulations verified the fact that the Commissioner also regarded Section 1700(e) of the Internal Revenue Code as being a tax statute separate and independent from Section 1700 (a), and in no wise to be considered as merely supplementary to Section 1700(a), the general admissions tax statute. Section 101.2 purported to define the term "admission" within the meaning of Section 1700(a) of the Internal Revenue Code and in addition contained language expressly providing that the tax under Section 1700 (a) did not relate to admissions to or charges for seats and tables in a cabaret, roof garden or similar place which were subject to tax under Section 1700(e). In 1926, the section of Regulations 43 corresponding to said Section 101.2 contained a sentence providing: "So an amount paid for the right to use a reserved seat in a theater or circus, a table in a roof garden, a seat in a hotel room or window to view a parade, or the like, is taxable." Article 3 of Regulations 43, The Federal Tax Service, 1926, Par. 6601, p. 1323.

In 1940, the word "hotel" was dropped from the above sentence, and in 1941 the sentence was changed to appear as it does today, as the phrase "a table in a roof garden" was omitted. This change appears to be another indication that Section 1700 (a) and Section 1700(e) of the Internal Revenue Code were regarded as separate and distinct tax statutes subsequent to 1941.

The examples which had been a part of Section 101.13 of Regulations 43 when it was Article 8 of Regulations 43, 1926 Ed., supra, and which had been contained in corresponding sections of Regulations 43 in succeeding years were no longer necessary due to the change in the basis for computing the cabaret tax and consequently were omitted from Section 101.13 of the 1941 Supplement to the Code of Federal Regulations.

Although Section 101.13 of Regulations 43 relating to the basis for computing the cabaret tax had been drastically changed in 1941, as noted above, Section 101.14 of Title 26, Code of Federal Regulations, 1941 Supp., entitled, "Entertainments included," was substantially the same as Section 101.14 of Title 26, Code of Federal Regulations, 1940 Supp., defining a public performance for profit at a roof garden, cabaret or other similar entertainment. However, there was included a paragraph in Section 101.14, 1941 Supp., which apparently was designed to cover these hotel cases: "Where music by an orchestra and a space in which the patrons may dance are furnished in the dining room of a hotel, or in a restaurant, bar, etc., the entertainment constitutes a public performance for profit at a roof garden, cabaret or similar place, and the payments made for admission, refreshment, service and merchandise are subject to the tax."

In 1941, Example No. 1 of Section 101.14 was changed from the way it had appeared as Example No. 1 of Article 9 of Regulations 43, 1926 Ed., set out above, and in corresponding Regulations in succeeding years. This Example had related to the case of a hypothetical proprietor of a dancing establishment who made no charge for "admission" or for dancing but did make a charge for refreshments furnished to his patrons. The intent of the Example under the 1926 Regulations was apparently to clarify the status of the charge for refreshments made by any such proprietor as including an admission charge. It would seem that Example No. 1 of Article 9, Regulations 43, was intended to relate to that type of "dancing establishment" which could be classified as a cabaret inasmuch as

it appears that dance halls or ballrooms do not follow the practice of making no charge for admission or for dancing. This conclusion would seem further substantiated by the use of quotation marks around the word "admission" in Example No. 1 of Article 9, Regulations 43, 1926 Ed., supra, indicating that the word was not being used in its generally accepted sense, such as an admission charge to a theater, opera, skating rink or the like. This said Example No. 1 was changed in Section 101.14 of the 1941 Regulations in that the hypothetical proprietor of the dancing establishment furnishing refreshments to his patrons now made an admission or cover charge to each patron. In accordance with the change in the basis for computing the cabaret tax which had been made by Section 542 of the Revenue Act of 1941, noted above, Example No. 1 of Section 101.14 of the 1941 Regulations was changed to provide that the admission or cover charge as well as the charges for refreshment, service and merchandise made by the hypothetical proprietor were subject to the cabaret tax under Section 1700(e) of the Internal Revenue Code. Apparently Example No. 1 was changed in order to demonstrate the different method of computing the cabaret tax because of the change in base effected by Section 542 of the Revenue Act of 1941, supra. It was no longer true that an admission charge or a cover charge (which, as noted above, had previously been held to be the equivalent of an admission charge) would be taxable under Section 1700(a) taxing admission charges generally, but rather, as Example No. 1 of Section 101.14 of the 1941 Regulations illustrated, such admission or cover charge was now taxable under Section 1700(e), as were other charges for refreshment, service or merchandise made by cabarets, roof gardens or the like. It does not appear that the change in Example No. 1 of Section 101.14 in the year 1941 was intended to make that example applicable to a different type of establishment than was referred to by such example prior to 1941.

Prior to the change in Example No. 1, Section 101.14 of Regulations 43 in the year 1941, noted above, the Treasury Department apparently was well aware that the usual practice of dance halls or ballrooms was to impose an admission charge upon each patron, for several earlier rulings had been made relative to the taxability of admission charges to dance halls. Informal ruling No. 5, dated July 28, 1932, provided: "An admission charge of ten cents to a park containing a dance pavilion is made. A further charge of 35 cents is made for a ticket entitling the purchaser to dance the entire evening. Many people enter the park by paying the 10 cents admission charge but do not dance and are not required to pay the 35 cents. Since the admission charges are separate and each is less than 41 cents, neither is subject to the tax." Standard Federal Tax Service, CCH, 1940, Par. 2303D, p. 5215.

Informal ruling No. 6, bearing the same date as informal ruling No. 5, just set out, provided: "Where a dancehall charges 40 cents admission and makes a compulsory charge of 10 cents for checking wraps, the total amount of 50 cents represents an admission charge subject to tax under the 1932 Act." Standard Federal Tax Service, CCH, 1940, Par. 2303D, p. 5216.

Another administrative ruling of the Treasury Department issued shortly after informal rulings No. 5 and 6, provided as follows:

"Advice is requested concerning the taxability of a certain ticket of admission to dances and whether the entire amount paid for such a ticket is subject to the tax.

"The ticket, which is perforated into three sections, is to be sold as one ticket. The first section is good for admission to the lounge, carrying a 40-cent charge; the second section is good for dance No. 1, which includes all dances until the intermission, carrying a charge of 20 cents; and the third section is good for the last dances, carrying a charge of 40 cents, making a total of $1.

"The Bureau has consistently held that where, after paying one admission charge, subsequent charges are made for accommodations which are essentially an extension of the accommodations granted in return for the payment of the first admis-

sion, the tax attaches to the total amount paid for the combination ticket.

"As each person attending the dance in the instant case pays the sum of $1 for admission and dancing, the total amount of $1 paid for the multiple or combination ticket is subject to a tax of 10 cents. The management is liable for the collection of such tax." S.T. 670, C.B. XII-1, 1933, 423. See also, Mim. 5255, supra.

Since Section 542 of the Revenue Act of 1941, supra, had shifted the liability for the "cabaret tax" to the person operating establishments of the type and kind subject to such tax and receiving payment for admission, refreshment, service and merchandise in connection with the operation of such establishments, the Commissioner of Internal Revenue issued a ruling on January 26, 1942, to the effect that: " * * * 'cabaret taxes' paid prior to 10 a.m. on October 1, 1941, [the effective date of the Revenue Act of 1941] are deductible from gross income by the person (i.e., the patron) paying for the admission, while 'cabaret taxes' paid subsequent to 10 a.m. on October 1, 1941, are deductible from gross income by the person (i.e., the proprietor or cabaret operator) receiving the payment for admission, etc." Mim. 5319, C.B. 1942-1, 62, 63.

The lower court decision in Deshler Hotel Co. v. Busey D.C.S.D.Ohio 1941, 36 F.Supp. 392, supra, was affirmed in Busey v. Deshler Hotel Co., 6 Cir., 1942, 130 F.2d 187, 142 A.L.R. 563. The decision by the United States Court of Appeals for the Sixth Circuit was issued at approximately the same time as was H.R.Report No. 2333, 77th Cong., 1st Sess., July 14, 1942, which contained no reference to Section 1700(e) or to the "cabaret tax." There is no indication, however, that the House knew of the impending United States Court of Appeals decision in the Deshler case at the time H.R. Report No. 2333, supra, was issued. The forceful language used by the United States Court of Appeals for the Sixth Circuit and the rather broad scope of its holding in affirming the decision of the lower Court in the Deshler case apparently convinced the Senate Committee on Finance, however, that there was a serious doubt whether the Treasury's interpretation of Section 1700(e), as contained in its Regulations under the 1941 amendment to said Section 1700(e), would be given any effect in a subsequent hotel dining room case similar to the Deshler case. A portion of the opinion of that Court appears as follows: "To summarize: Sec. 500(a) (5) of the Revenue Act of 1926 is plain and unambiguous, leaving no appropriate occasion for enlargement of its scope by interpretative regulations of the Treasury Department. The Ionian, or Grill Room of the appellee hotel company has been found by the district court upon abundant evidence not to have been as a matter of fact a roof garden, cabaret, or other similar entertainment, *to which the charge for admission was wholly or in part included in the price paid for refreshment, service, or merchandise.* This finding of fact is deemed determinative of the issue involved." Busey v. Deshler Hotel Co., 130 F.2d 187, 192.

The doubt concerning the validity of the 1941 Treasury Regulations 43 would seem to be justified by the case of Schuster's Wholesale Produce Co. v. United States, D.C.W.D.La.1943, 49 F.Supp. 909. That case involved a liquor store which maintained in the back of the building a dance floor with a nickelodeon which was played by the insertion of coins by anyone present who could dance or not as he saw fit. The prices for drinks were the same in both the front and back rooms and there was no admission charge to either room, but on Saturday nights there was a 50¢ minimum charge imposed upon those served in the back room. The Government claimed the plaintiff was taxable as a cabaret, roof garden or other similar entertainment under Section 1700(e) of the Internal Revenue Code, as amended by Section 542 of the Revenue Act of 1941, supra. In a decision rather closely paralleling the lower court decision in Deshler Hotel Co. v. Busey, supra, the Court held that there was no admission charge as such made by the plaintiff and no public performance, therefore Section 1700(e) did

not apply. The Court indicated, 49 F.Supp. at page 911, that there was a marked difference between the 1941 and 1942 amendments to Section 1700 of the Code and the real reason for the enactment of the 1942 amendment to Section 1700 apparently was to meet the decisions in the Broadmoor and Deshler cases. However, the Schuster case was concerned with a period prior to the 1942 amendment and the Court held Section 1700(e) of the Internal Revenue Code not applicable to the plaintiff's establishment.

A case very similar to Schuster's Wholesale Produce Co. v. United States, supra, and which in fact followed the decision of that case, was Sir Francis Drake Hotel Co. v. United States, D.C.N.D.Cal. 1947, 75 F.Supp. 668. Plaintiff in the latter case operated within its hotel two bars located adjacent to a room containing a restaurant wherein food and beverages were dispensed and in the evening dancing and entertainment afforded the patrons. Although the bars were separated from the restaurant by a low wooden partition and the patrons of the bars were not permitted access in the evening to the room in which the restaurant was located or to its dance floor, the entertainment in the restaurant room was visible from portions of the service area surrounding the bars. There was no admission charge to either bar nor was there any charge made therein for entertainment. The prices of food, beverages and refreshments in the bars were constant and unchanged regardless of whether entertainment was or was not furnished in the restaurant. The case arose under Section 1700(e) of the Internal Revenue Code, supra, as amended by Section 542 of the Revenue Act of 1941, supra, and involved the period from October 1, 1941, to October 31, 1942. The Court cited Schuster's Wholesale Produce Co. v. United States, supra, with approval in holding that these two bars were not roof gardens, cabarets, or other similar places of entertainment to which a charge for admission was wholly or in part included in the price paid for refreshment, service or merchandise, and thus held the plaintiff

not taxable under Section 1700(e) of the Internal Revenue Code.

In Kentucky Hotel, Inc., v. Glenn, W.D. Ky.,1944, the Court held that where entertainment was furnished patrons and others by a hotel in a room adjoining the lobby and dining room, but no extra charge was made for food or service sold therein, nor included in prices for the same, and the room was open to the public generally regardless of whether or not they were guests or customers of the taxpayer, the tax levied under Section 542(a) of the Revenue Act of 1941 (amending Section 1700(e) of the Internal Revenue Code) was improperly assessed and collected.

In view of the situation disclosed by the above decisions, the Senate Committee on Finance in Senate Report No. 1631, 77th Cong., 2d Sess., October 2, 1942, apparently decided to confirm the Treasury Department's interpretation of Section 1700(e). It is interesting to note that this Senate Report was issued several months after the decision of the United States Court of Appeals in the Deshler Hotel case. This Senate Report provided as follows:

"Summary of Principal Changes

\*   \*   \*   \*   \*   \*

"13. Cabaret Tax.

"The existing law with respect to cabaret tax is amended by your committee by subjecting to a 5 per cent tax all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' is clarified, and a performance is to be regarded as being furnished for profit for the purpose of this tax even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of the performance." p. 60.

"Detailed Discussion of the Technical Provisions of the Bill

\*   \*   \*   \*   \*   \*

"Section 621. Cabaret Tax.

"This section, which has been added to the bill as passed by the House, amends

section 1700(e) (1) of the Code. This provision of the Code imposes the 5 per cent tax on amounts paid for admission, refreshment, service, or merchandise at any roof garden, cabaret, or similar place furnishing a public performance for profit.

"In order to allay possible questions under the present statute, the amendment specifies that the tax, levied on amounts paid by or for any patron or guest entitled to be present during any portion of the performance, shall be applicable although no increase is made in the charges for admission, refreshment, service, or merchandise by reason of the furnishing of the performance. Thus the tax will be collected although a cabaret does not increase its prices for food or beverages while its floor show is in progress. The amendment confirms the Treasury Department's interpretation of the present statute by stating that the tax is applicable in the case of any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise." Senate Report No. 1631, supra, at p. 268.

This amendment proposed by the Senate was agreed to by both Houses in the Committee of Conference Report to accompany H.R. 7378, H.R. Report No. 2586, 77th Cong., 2d Sess., October 19, 1942, 79, amendment No. 499. Section 622 of the Revenue Act of 1942 contained the provisions of this amendment as follows:

"Section 622. Cabaret Tax.

"Section 1700(e) (1) (relating to rate of cabaret tax) is amended to read as follows:

" '(1) Rate. A tax equivalent to 5 per centum of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term "roof garden, cabaret, or other similar place" shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance. No tax shall be applicable under subsection (a) (1) on account of an amount paid with respect to which tax is imposed under this subsection.' "

Section 622, set out above, contains the same language as does Section 1700(e) of the present Internal Revenue Code although the present rate of tax is changed by Section 1650 of the Code. It should be noted that in the year 1942 for the first time in the language of the statute itself there appears a definition of the term "roof garden, cabaret, or other similar place." It seems clear from the above discussion that by including such definition in the body of the statute Congress intended to support the position the Treasury Department had taken in its Regulations, that hotel dining rooms similar to those in the cases of United States v. Broadmoor Hotel Co., supra, and Busey v. Deshler Hotel Co., supra, should come within the category of a "roof garden, cabaret or other similar place furnishing a public performance for profit" within the meaning of Section 1700(e) of the Internal Revenue Code. T.D. 5192, C.B. 1942–2, 249, approved December 3, 1942, quoted the provisions of Section 622 of the Revenue Act of 1942 and in addition amended Section 101.13 and Section 101.14 of Title 26, Code of Federal Regulations, 1941 Supp., in accordance with the changes brought about by Section 622 of the Revenue Act of 1942.

That Congress had apparently achieved at least in part the desired results by virtue of the enactment of Section 622 of the Revenue Act of 1942, amending Section 1700(e) of the Internal Revenue Code, is indicated in two decisions involving the operators of establishments containing bars for the dispensing of hard and soft drinks

and which contained nickelodeons furnishing music to which their patrons could dance. The plaintiff in Rogers v. Stuart, D.C.Ariz.1945, 80 F.Supp. 436, operated an establishment serving food, liquor and soft drinks to the patrons. There was a bar located at one end of the room, which also contained an open dance floor. The patrons could secure mechanical music for dancing by the insertion of coins into a nickelodeon. No other type of amusement or entertainment was provided by the plaintiff during the period in question. There was no admissions charge to plaintiff's establishment; no minimum or cover charges were collected at any time, and the prices charged for food and drink were not increased during any period in which the establishment was open for business whether or not dancing was allowed. The period involved was from February 1, 1942, to November 30, 1942. The Court held that for the period from February 1, 1942, to November 1, 1942, there was no performance for profit by the plaintiff and he was not subject to tax under Section 1700(e) of the Internal Revenue Code, supra, as amended by Section 542 of the Revenue Act of 1941, supra. However, Section 622 of the Revenue Act of 1942, supra, amending Section 1700(e) of the Internal Revenue Code went into operation November 1, 1942, and the Court held that for the period from November 1, 1942, to November 30, 1942, plaintiff was subject to the tax under Section 1700(e) of the Code.

A similar factual situation was present in the case of Baldwinson v. United States, D.C.W.D.Wash.1948, 80 F.Supp. 687, where the plaintiff operated a tavern located in a single large storeroom containing a bar, booths, a dance floor and a juke box or nickelodeon. The plaintiff in the Baldwinson case did not serve food to the patrons and the period involved was from July 1, 1945, to August 31, 1946. The Court held the plaintiff subject to tax under Section 1700(e) of the Internal Revenue Code, as amended by Section 622 of the Revenue Act of 1942.

In connection with these cases it might be of interest to note that a private club which was a non-profit corporation and which admitted only members and guests was held not subject to the so-called cabaret tax. Lambeth v. United States, D.C.Or.1948, 89 F.Supp. 43. One of the current looseleaf tax services also contains a paragraph to the effect that, "It is understood that the Bureau now holds that 'mere presence of a television set in a public bar or dining room does not make it liable for cabaret tax.'" CCH, 1949, Par. 2339, p. 6522.

In 1943, with the United States facing large wartime expenditures, Congress passed the Revenue Act of 1943. Section 302 of that Act, infra, amended Section 1650 of the Internal Revenue Code, increasing both the tax on admissions and the tax on cabarets, roof gardens, etc. The House Committee on Ways and Means report to accompany H.R. 3687, which became the Revenue Bill of 1943, H.R.Report No. 871, 78th Cong., 1st Sess., November 18, 1943, 25, indicated that the House Committee deemed it desirable to increase excise taxes considerably as one means of securing substantial additional revenue. At p. 30 of H. R. Report No. 871, supra, cabarets were especially singled out in the following language:

"Cabarets

"Increasing the cabaret tax from 5 to 30 per cent of the total bill would yield an increase of $91,300,000 in revenue. With the exception of a few roadhouses that have been hurt by the gasoline shortage, cabarets have been experiencing an unprecedented demand for their entertainment services. It is felt that this is more of a luxury than those services which are subject to the general admissions tax which is a minimum of 20 per cent."

It is interesting to note that a table of excise taxes contained in H.R.Report No. 871 and showing the old rates in comparison with the new war rates recommended by the House, indicated that the so-called cabaret tax would be increased 500 per cent whereas the tax on admissions would be increased only 100 per cent.

The Senate Committee on Finance did not favor increasing the excise tax rates by as large a margin as that recommended by the House. Senate Report No. 627, 78th

Cong., 1st Sess., December 22, 1943, pp. 12–15. The portion of the Senate Report relating to cabarets provided, pp. 14–15:

"Cabarets.

"The House bill raised the tax on cabarets from 5 per cent to 30 per cent of the total charge, bringing in $91,300,000 in additional revenues. Your committee modifies this increase to 20 per cent, reducing the estimated additional yield to $54,800,000. It appeared that the suddenness of the increase from 5 per cent to as high as 30 per cent would interfere seriously with patronage and jeopardize the revenue yield. Cabarets is defined so as to include many local eating places that simply offer recorded music and dancing facilities."

However, both Houses ultimately agreed on substantial increases in both the admissions tax and the so-called cabaret tax. H. R. Report No. 1079, 78th Cong., 2d Sess., February 4, 1944, 65. In accordance with the provisions of H. R. Report No. 1079, supra, Section 302 of the Revenue Act of 1943, 26 U.S.C.A.Int.Rev.Acts, 1943, p. 470, amending Section 1650 of the Internal Revenue Code, imposed a war tax rate on admissions of 1 cent for every 5 cents or major fraction thereof, and on cabarets, roof gardens, etc., a war tax rate of 30 per cent of all amounts paid for admission, refreshment, service or merchandise. T.D. 5349, C.B.1944, 644, approved March 17, 1944, was issued to conform Regulations 43, 1941, to Chapter 10 of the Internal Revenue Code, as amended by Section 302 of the Revenue Act of 1943. Mim. 5699, C.B. 1944, 647, issued June 13, 1944, was primarily intended to clarify the provisions of Regulations 43 in effect at that time having to do with the taxability of amounts paid for refreshment, service or merchandise in a room which is entirely separate from the entertainment room.

"To Collectors of Internal Revenue and Others Concerned:

"Section 1700(e) of the Internal Revenue Code, as amended and as modified by section 302 of the Revenue Act of 1943, effective April 1, 1944, imposes a tax equivalent to 30 per cent of all amounts paid for admission, refreshment, service, and merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. As defined in the statute, the term 'roof garden, cabaret, or other similar place' includes any room in any hotel, restaurant, or other public place, where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise.

"Section 101.14 of Regulations 43, as amended by Treasury Decision 5192 C.B. 1942-2, 249, provides in part as follows:

"Amounts paid for refreshment, service, or merchandise in a room which is entirely separate from the room in which entertainment is furnished are not subject to tax, provided that the patrons in such separate room may not witness the entertainment and any door in the wall or partition separating the two rooms remains closed during the period of the entertainment except when persons pass from one room to the other.

"The rules stated hereunder are issued in clarification of these provisions of the regulations, and for guidance in determining their application to establishments at which the serving or selling of food, refreshment, or merchandise takes place in a room separate from that in which music and dancing privileges or other forms of entertainment are furnished.

"To permit a simple statement of the rules, the separate room in which music and dancing privileges or other forms of entertainment are furnished will be referred to hereinafter as the 'entertainment room'; the room in which the serving or selling of food, refreshment, or merchandise takes place, as the 'related room'; and the amounts paid for admission, refreshment, service, and merchandise, as 'payments for refreshments, etc.'

"Payments for refreshments, etc., made by or for the patrons or guests in the related room are subject to the cabaret tax if such patrons or guests may witness from

the related room the entertainment furnished in the entertainment room.

"Where the patrons or guests in the related room can not witness the entertainment in the entertainment room but are entitled to the privilege of entering the entertainment room and dancing or witnessing the entertainment therein, the cabaret tax applies to the payments for refreshments, etc., made by or for those patrons or guests in the related room who exercise such privilege.

"Where the patrons or guests in the related room can not witness the entertainment in another room but acquire the right to enter the entertainment room by paying an admission charge or other stipulated sum, the cabaret tax applies to all payments for refreshment, etc. (including such admission charge or other stipulated sum), made by or for those patrons or guests in the related room who exercise the right of entry into the entertainment room by paying such admission charge or other stipulated sum.

"Payments for refreshments, etc., made by or for the patrons or guests in the related room who can not witness the entertainment in another room and do not exercise the privilege of entering the entertainment room and dancing or witnessing the entertainment in such room are not subject to the cabaret tax.

"Other questions have arisen concerning the application of the cabaret tax to payments for refreshments, etc., received by proprietors during the period prior to the commencement of the dancing or other form of entertainment furnished by the establishment. The following rules are set forth for determining the application of the cabaret tax to such payments:

"Inasmuch as the cabaret tax is specifically imposed on all amounts paid for admission, refreshment, service, and merchandise by or for any patron or guest who is entitled to be present during any portion of the dancing or entertainment, it must be held that the payments for admission, refreshment, service, and merchandise made prior to the commencement of the dancing or other entertainment are subject to the cabaret tax in all cases where the patrons or guests by or for whom such amounts are paid remain for any portion of the period of dancing or entertainment. On the other hand, payments made by or for patrons or guests who leave the establishment prior to the commencement of the dancing or other entertainment are not subject to the cabaret tax.

"MT. M-Mimeograph 5691 * * * is hereby revoked; and all other previous rulings inconsistent with the provisions of this mimeograph are also revoked in so far as they are inconsistent herewith."

This amendment to the Regulations apparently has been followed by the courts, for in McKenzie v. Maloney, D.C.Ore. 1946, 71 F.Supp. 691, the proprietor of a restaurant adjoining a separate room for entertainment was held not subject to the so-called cabaret tax since the door between the two rooms remained closed except when waitresses passed through it.

Section 3 of the Public Debt Act of 1944, approved June 9, 1944, 58 Stat. 272, amended Section 1650 of the Internal Revenue Code by reducing the war tax rate on cabarets, roof gardens, etc., from 30 per cent to 20 per cent. T.D. 5385 C.B.1944, 638, approved June 30, 1944, was issued to conform Regulations 43, 1941, under Chapter 10 of the Internal Revenue Code to the amendments as provided in Section 3 of the Public Debt Act of 1944.

In 1945 the House Committee on Ways and Means in a report to accompany H.R. 4309, H.R. Report No. 1106, 79th Cong., 1st Sess., October 9, 1945, 1, 2, 11, proposed reductions in many of the temporary war excise tax rates, back to their pre-war levels, as of June 30, 1946, rather than six months after the termination of hostilities, as had been provided in the Revenue Act of 1943.

The Senate Committee on Finance in Senate Report No. 655, 79th Cong., 1st Sess., October 23, 1945, 1, 22, expressed disagreement with these recommended reductions. In H.R. Report No. 1165, 79th Cong., 1st Sess., October 29, 1945, both Houses agreed to continue the war excise tax rates until the termination date provided for in the Revenue Act of 1943.

The Excise Tax Act of 1947, H.R. 1030, Public Law 17, 80th Cong., 1st Sess., Chap. 17, 61 Stat. 12, however, provided for the continuance of certain war excise tax rates (including those on admissions and cabarets) beyond six months after the date of cessation of hostilities. T.D. 5562, C.B. 1947-1, 220, was issued to conform Regulations 43 to the Excise Tax Act of 1947.

Thus, as has been noted previously, at the present time Section 1700(a) of the Internal Revenue Code imposes a tax on amounts paid for admissions to any place, and Section 1650 of the Internal Revenue Code provides that the rate of tax on such amounts paid as admissions to any place shall be 1 cent for every 5 cents or major fraction thereof. On the other hand Section 1700(e) of the Internal Revenue Code imposes a tax upon "all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit," and Section 1650 of the Code provides that the rate of this "cabaret tax" shall be 20 per cent.

There have been a number of rulings issued in regard to the admissions tax under Section 1700(a) of the Internal Revenue Code. These rulings would indicate that they were intended to apply to those types of entertainment establishments which impose a direct admission charge upon their patrons such as a theater, opera, skating rink, ballroom or dance hall, rather than to the type of establishment which imposes no direct admission charge on its patrons, such as a cabaret or night club. Representative examples of rulings concerning the admissions tax section are: T.D. 5129, C.B. 1942-1, 271; M.T. 6, C.B. 1942-2, 245; M.T. 29, C.B. 1948-2, 166; M.T. 30, C.B. 1948-2, 167. A recent decision of the United States Supreme Court dealing with Section 1700(a) of the Internal Revenue Code, the admissions tax section, is Wilmette Park District v. Campbell, 1949, 70 S.Ct. 195. Lower court opinions in this case are commented on in, 61 Harvard Law Review 894 (1948); 42 Illinois Law Review 818 (1948).

The plaintiffs introduced a considerable amount of documentary and oral evidence as to the inconsistency on the part of the Treasury Department in the interpretation of Section 1700(e) and the application of that section to ballrooms of the type and kind operated by the plaintiffs. The plaintiffs' documentary evidence as to this phase of the case consisted of a considerable number of rulings contained in letters from Treasury Department officials. All of these were made after the amendment to Section 1700(e) in 1942. The testimony of witnesses established that the ballrooms referred to in those rulings were in general of the type and kind operated by the plaintiffs and that there had been no change in the manner of their operation from 1941 up to and including the present time. Representative examples of such rulings are next set forth:

"Treasury Department
"Washington 25
"September 15, 1944
"Office of
Commissioner of Internal Revenue

---

"Address Reply to
Commissioner of Internal Revenue
and refer to
MT:M:HCH

"Mr. Sidney C. Nierman
"24th Floor
"33 North LaSalle Street
"Chicago 2, Illinois
"Dear Mr. Nierman:

"Reference is made to your letter of September 1, 1944, transmitting additional information relative to the question of the liability of the Aragon and Trianon Ballrooms, Chicago, Illinois, for collection of tax on admissions or for tax on cabaret charges imposed by section 1700 of the Internal Revenue Code, as amended.

"The evidence shows that the dance hall in each case is situated on the second floor of the building, the first floor consisting of lobbies and checkrooms. The area of each ballroom is approximately thirteen thousand square feet, and five thousand persons can dance without undue crowding. There are balconies on which tables are provided for the serving of sandwiches and drinks. In the Trianon Ballroom there is a separate room known as the Glamour Room on the

same floor as the dance floor, where liquors are served at a bar, and a lounge which seats about twenty persons. On the balcony of each of the ballrooms are chairs and tables which will seat approximately eight hundred persons. It is stated that over a period of seven years, the sale of sandwiches and drinks have comprised approximately 31 percent of the gross admissions to the ballrooms, and the average sale per patron is 35 cents.

"The admission charges at the present time are 75 cents, except Saturdays, Sundays and holidays, when the charge is 95 cents. Checking facilities are furnished without additional charge.

"After consideration of the additional evidence submitted showing the manner in which the ballrooms are operated it is held that the entertainment furnished at the Aragon Ballroom and at the Trianon Ballroom does not constitute a public performance for profit at a roof garden, cabaret, or similar place within the meaning of section 1700(e) of the Internal Revenue Code, as amended, and that the amounts paid for refreshment, service and merchandise are not subject to the cabaret tax.

"The charges for admission to the ballroom, however, are subject to the tax imposed by section 1700(a) of the Code, as amended, at the rate of one cent for each five cents, or major fraction thereof.

"Very truly yours,
"/s/ D. S. Bliss
"Deputy Commissioner"

"Treasury Department
"Washington 25
"March 6, 1947
"Office of
Commissioner of Internal Revenue
"Address Reply To
Commissioner of Internal Revenue
and refer to
MT:M:AWH
"Miss Alice McMahon
"Indiana Roof Ballroom
"West Washington Street
"Indianapolis, Indiana
"Dear Miss McMahon:
"Reference is made to your letters of January 15 and 24, 1947, and attached ex-

hibits, including a copy of your letter of October 7, 1946, addressed to the Collector of Internal Revenue, Indianapolis, Indiana, protesting the proposed assessment of $18,200.66 additional cabaret tax for the period April 1944 through August 1946.

"The assessment was recommended in a report of an investigation which disclosed that the ballroom is open on Wednesday, Friday, Saturday and Sunday nights. The box office is located on the street floor. Elevator service is furnished to the fourth floor where the checkroom is located, and a stairway leads to the fifth floor and the ballroom. Tickets of admission are collected at the foot of the stairway. The ballroom can accommodate approximately 3800 persons and has 382 tables and 1240 chairs around the dance floor and on the balcony. Music for dancing is furnished by an orchestra from a raised bandstand and the entertainment is visible from all seats. No other entertainment is furnished. The prices of admission, including tax, are 80 cents on Wednesdays, 80 cents on Fridays until 8:30 p. m., and $1.00 thereafter, $1.10 on Saturdays and 80 cents on Sundays until 8 p. m. and $1.00 thereafter. The prices are increased when 'name' bands are engaged and vary from $1.25 to $2.00. On New Year's Eve the price is $2.50.

"There is no kitchen or cooking facilities for the preparation of food. No menus are provided and only soft drinks and popcorn are sold. Patrons may purchase refreshments at the refreshment bars or may be served at their tables. The receipts from refreshments for the season ended June 1946 were 26.6 percent of the admission receipts. A checkroom is provided and a charge of 10 cents is made to persons who wish to use this service.

"You state that the Indiana Roof is licensed as a dance hall by The American Society of Composers, Authors and Publishers, which has separate classifications for dance halls and cabarets. You are recognized as the only woman ballroom operator in this country, while there are a great number of women operating cabarets You are and have been a Director of the Midwest Ballroom Operator's Association

since 1941. This organization does not accept operators of cabarets, night clubs or roof gardens for membership.

"You further state that you have leased and operated the Indiana Roof Ballroom since 1940. It has an approved capacity of approximately 3800 persons and table accommodations for 1240. The ballroom is available for rental to such organizations as schools, churches, and labor and fraternal organizations. No food or liquor is sold on the premises; only soft drinks such as Coca-Cola, root beer, etc., and popcorn are served.

"When the 30 percent cabaret tax rate went into effect you contacted the local agent and asked if the admissions tax should be raised from 20 to 30 percent and were informed that it should remain at 20 percent. Since April 1944 the collector's office has inspected your records for various reasons and in no instance has the inspector brought up the question of cabaret tax.

"You request to be advised (1) whether the Indiana Roof Ballroom is to be considered a cabaret within the meaning of section 1700(e) of the Internal Revenue Code, as amended, and (2) if it is ruled to be a cabaret is such ruling to be made retroactive for a period during which you did not collect the tax from your patrons because of assurances from a representative of the collector's office that you should collect tax only on admissions.

"Careful consideration has been given to all of the evidence submitted. It is held that the entertainment furnished at the Indiana Roof Ballroom does not constitute a public performance for profit at a roof garden, cabaret or other similar place within the meaning of section 1700(e) of the Code, as amended, and that amounts paid for refreshment, service and merchandise are not subject to the cabaret tax.

"The charges for admission to the ballroom are subject to the tax imposed by section 1700(a) of the Code, as amended.

"In view of the above the proposed assessment will not be made.

"Very truly yours,
"/s/  Charles J. Valaer
"Acting Deputy Commissioner"

A number of such letter rulings had to do with ballrooms as conducted in the State of Iowa:

"Treasury Department
"Washington 25
"MT:M:OES
"September 16, 1944
"Collector of Internal Revenue
"Des Moines 8, Iowa
"Attention: MT:M:FJH

"Reference is made to letters from this office addressed to you dated June 15, and July 27, 1944, in which it was held that the entertainment furnished in the Danceland Ballroom, Cedar Rapids, Iowa, constitutes a public performance for profit and the amounts paid for admission, refreshment, service, and merchandise were subject to the cabaret tax.

"The evidence on file shows that the dance floor in the ballroom is 51½ feet wide and 98 feet long. The ballroom is open on an average of four nights a week and to be admitted it is necessary for the patron to purchase a ticket. The music for dancing is furnished by various orchestras and sometimes there is singing.

"Soft drinks, beer, cigarettes, candy, and popcorn may be purchased at the bar and also may be served to patrons sitting at the tables located on two sides of the dance floor. Tables may be reserved in advance or at the time the patrons enter the place, for which there is a charge depending on the number of persons. It is stated that patrons pay the admission charge to enter the establishment primarily for the purpose of dancing. They are not required to purchase refreshments, etc., or to reserve tables. Receipts from the sale of refreshments, etc., are approximately 35 per cent of the total receipts.

"This office has given reconsideration to the question of whether establishments operating in a manner similar to the Danceland Ballroom are liable for collection of tax on admissions, or for payment of tax on cabaret charges. It is now held that the Danceland Ballroom is operated primarily as a dance hall and the entertainment furnished therein does not constitute a public performance for profit at a roof garden,

cabaret, or similar place, and the amounts paid for admission, refreshment, service, and merchandise are not subject to the cabaret tax.

"The charges for admission to the Danceland Ballroom are subject to the tax imposed by section 1700(a) of the Internal Revenue Code, as amended, at the rate of 1 cent for each 5 cents or major fraction thereof. The tax also attaches to the charges for reserved seats or tables.

"(Signed) D. S. Bliss
"Deputy Commissioner"

"Treasury Department
"Internal Revenue Service
"Des Moines 8, Iowa
"October 12, 1944
"C. J. Fox
"Surf Ballroom
"Clear Lake, Iowa
"Dear Mr. Fox:

"Reference is made to your letter of Aug. 16th concerning liability for tax as a cabaret in the operation of the Surf Ballroom at Clear Lake, Iowa, and the Terp Ballroom at Austin, Minnesota. The case was presented to the Commissioner of Internal Revenue for consideration and he has now replied stating:

" 'It is held that the entertainment furnished in the Surf Ballroom and in the Terp Ballroom does not constitute a public performance for profit at a roof garden, cabaret, or similar place within the meaning of section 1700(e) of the Internal Revenue Code, as amended, and that amounts paid for refreshment, service and merchandise are not subject to the cabaret tax. The charges for admission to the ballrooms and the charges for reserved seats are subject to the tax imposed by section 1700(e) [1] of the Internal Revenue Code, as amended.'

"Very truly yours,
"E. H. Birmingham
"Collector
"By: Frances J. Hyde, Chief
"Miscellaneous Tax Division"

"Treasury Department
"Internal Revenue Service
"Des Moines, Iowa
"October 28, 1944
"Office of the Collector
"District of Iowa
"In Replying Refer To
MT:M:FJH
"T. H. Archer, Owner
"Tromar and Val-Air Ballrooms
"P. O. Box 326
"Des Moines, Iowa
"In re:
Tromar Ballroom, Des Moines, Iowa
Val-Air Ballroom, Des Moines, Iowa
Skylon Ballroom, Sioux City, Iowa
Shore Acres Ballroom, Sioux City, Iowa
Chermot Ballroom, Omaha, Nebraska
Arkota Ballroom, Sioux Falls, South Dakota
Frog Hop Ballroom, St. Joseph, Missouri
"Dear Mr. Archer:

"Reference is made to your letter of October 9th concerning liability for tax on cabaret charges imposed by Section 1700(e) of the Internal Revenue Code as amended in connection with the operation of the above named ballrooms.

"The case was submitted to the Commissioner of Internal Revenue for consideration and he has replied stating:

" 'It is stated that the Chermot Ballroom was destroyed by fire on December 16, 1943, and that it has been rebuilt and will open soon. The ballrooms which are operated by Mr. Archer are open for dancing from two to four nights of the week, the Val-Air and Shore Acres Ballrooms being operated only during the months of June, July and August. On nights when the ballrooms are not operated by the management, they are rented to various organizations such as the American Legion, labor unions, Civil Air Patrol, college fraternities and sororities, etc. All of the ballrooms open at 9:00 P.M. and close from midnight to

---

1. This letter to C. J. Fox is a copy of the original. It is indicated that the section referred to in the last sentence of said letter should be Section 1700(a) of the Internal Revenue Code, rather than Section 1700(e).

1:00 A.M. On evenings when the ballrooms are operated by Mr. Archer, charges are made for admission, the charge varying with the day of the week and the quality of the orchestra furnishing the dance music for the particular engagement. The charges range from 44 cents to $1.20 including State and Federal taxes.

" 'Each ballroom has tables and booths and a fountain or refreshment stand for the convenience of the patrons. Soft drinks, popcorn and cigarettes are sold in the ballrooms and beer is sold only in the Arkota, Skylon and Shore Acres Ballrooms. Candy and peanuts are also sold in the Arkota Ballroom. The receipts from the sale of refreshments average from 25 percent to 32 percent of the gross receipts. The only entertainment furnished is music and dancing.

" 'After consideration of the evidence submitted showing the manner in which the ballrooms are operated, it is held that the entertainment furnished does not constitute a public performance for profit at a roof garden, cabaret, or similar place within the meaning of section 1700(e) of the Internal Revenue Code, as amended, and that amounts paid for refreshment, service and merchandise are not subject to the cabaret tax.

" 'The charges for admission to the ballrooms, however are subject to the tax imposed by section 1700(a) of the Internal Revenue Code, as amended.

" 'With respect to the Chermot Ballroom, if, upon reopening, it is operated similar to the other ballrooms owned by Mr. Archer, the same rulings will apply.'

"Very truly yours,

"E. H. Birmingham

"Collector

"By: /s/ Frances J. Hyde

"Chief Miscellaneous Tax Division"

The plaintiffs received the following letter ruling relating to their ballroom:

"Treasury Department
"Internal Revenue Service
"Des Moines, Ia.
"September 21, 1944
"File MT:M:FJH
"Larry Geer, Mgr.
"Laramar Ballroom
"P. O. Box 5
"Fort Dodge, Ia.
"Dear Mr. Geer:

"Reference is made to your letter of August 21st concerning your liability for tax as a cabaret. The case was presented to the Commissioner of Internal Revenue who has now replied stating as follows:

" 'It is stated in Mr. Geer's letter that the Laramar Ballroom is an establishment that is generally and customarily known in the amusement world as a dance hall and there have been no changes in any respect pertaining to the operation of the establishment since the above ruling was requested. It is a place with a large dance floor which people frequent for the main purpose of dancing to music furnished by so-called dance orchestras. Public dances are conducted by the owners of the ballroom on certain nights each week and on other nights the ballroom is rented by various organizations for public and private dances and parties. The organizations renting the ballroom hires the orchestra and, unless the dance or party is a private affair, collects the admission charge. The ballroom is open only on evenings when a dance or party is held, usually three nights each week.

" 'The admission charge, which varies according to the quality of the orchestra furnishing the music, entitles the patron to remain in the ballroom the entire evening. Soft drinks, candy, chewing gum, cigarettes and peanuts are sold therein but patrons are not required to purchase any of these items in order that they may be permitted to dance or listen to the music. No food, liquor or beer is sold in the ballroom. A checkroom is provided and if a patron desires to check his wraps there is a charge of 10 cents for such service.

" 'In view of the foregoing, it is held that the Laramar Ballroom is still operated primarily as a dance hall and the amounts paid for admission thereto are properly subject to the tax imposed by section 1700 (a) of the Internal Revenue Code, as amended. Amounts paid for refreshments, etc., by the patrons in the dance hall are not subject to the 20 percent cabaret tax imposed by section 1700(e) of the Code, as amended.'

"Very truly yours,
"E. H. Birmingham, Collector
"By: Frances J. Hyde, Chief
"Miscellaneous Tax Division."

The plaintiffs had also received a letter, dated December 20, 1941, ruling that the provisions of Section 1700(e) were not applicable to the ballroom operated by them.

It is of interest to note that in December, 1942, after the enactment of the 1942 amendment to Section 1700(e) and while the rate of the so-called cabaret tax under Section 1700(e) was 5 per cent and the rate of tax on admissions under Section 1700(a) was approximately 10 per cent, the operator of a ballroom at Lincoln, Nebraska, known as the Turnpike Casino, was unsuccessful in his attempt to have the Treasury Department classify his establishment as a cabaret. The testimony in this case established that said Turnpike Casino was a ballroom of the same type and kind as that operated by the plaintiffs. The ruling on the Turnpike Casino is contained in the following letter:

"Treasury Department
"Internal Revenue Service
"Omaha, Nebr.
"Office of the Collector
"District of Nebraska
"In Replying Refer to
MT:JOM:LEC
"December 18th, 1942
"Mr. Pauley
"Turnpike Casino
"South 14th Street
"Lincoln, Nebraska
"Dear Sir:
"Deputy Collector Sorensen indicates in his letter of December 15th that you wish a hearing in this office before we report for assessment additional tax due for the period from February 1st to August 1st, 1942 on admissions to the Turnpike Casino. In our opinion no useful purpose could be served by a conference relative to this matter. This office must be guided by the rulings issued by the Commissioner of Internal Revenue. The rulings which have been issued to date leave no question as to the taxability of your establishment. There seems to be no possible reason for taxing the Turnpike Casino on the basis of the cabaret tax rather than on the admission tax basis.

"Respectfully,
"/s/ G. W. O'Malley
"Collector."

On December 2, 1948, the defendant Collector for the first time notified the plaintiffs that they were subject to the so-called cabaret tax imposed under the provisions of Section 1700(e). The notification was made by means of a mimeographed bulletin sent to the plaintiffs and others operating ballrooms in the State of Iowa. A number of the witnesses in this case either operated or had to do with the operation of ballrooms both in Iowa and adjoining or nearby States. These witnesses testified that in Iowa the Collector of Internal Revenue has been, since December 2, 1948, demanding and collecting the tax in question from the operators of establishments of the type and kind operated by the plaintiffs, while in a number of adjoining or nearby States, up to the time of the trial of this case on December 1 and 2, 1949, the Collectors in those States were not demanding or collecting such tax. Among such adjoining or nearby States are the States of Illinois, Minnesota, and Kansas. Since the matter of the collection of Federal excise taxes is not a matter of "local option," it will be and is assumed that the defendant Collector in the present case is acting in accordance with instructions from the Treasury Department. The record does not show that either the Commissioner of Internal Revenue or the Deputy Commissioner of Internal Revenue has as yet given notice under the signature of either of them that a change had been and

was being made in the interpretative rulings and administrative practice that had been followed by the Treasury Department for a long period of time in regard to the liability of operators of ballrooms of the type and kind operated by the plaintiffs for the so-called cabaret tax. However, it will be and is assumed that it is the present interpretation of the Commissioner that the operators of such ballrooms are liable for such tax and that his rulings and practice are or will be in conformity with such interpretation. It is believed that the variation between Collector Districts in regard to the matter of the collection of the tax in question from ballrooms of the type and kind operated by the plaintiffs is not of particular legal significance. Such variation could be regarded as being merely incidental to the transition from one administrative practice to the reverse of that practice.

The defendant Collector asserts that the plaintiffs are liable for the tax in question, contending that the prior interpretations, rulings and practice referred to do not work an estoppel against him in the present case. He cites a number of authorities in support of his contention. The authoritative holdings are in accord with his contention. Higgins v. Commissioner, 1941, 312 U.S. 212, 215, 216, 61 S.Ct. 475, 85 L.Ed. 783. See Walker-Hill Co. v. United States, 7 Cir., 1947, 162 F.2d 259, 262–263, certiorari denied 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356. It appears that the plaintiffs do not contend to the contrary. However, it is the contention of the plaintiffs that the previous administrative rulings and previous administrative practice of the Treasury Department, noted above, do deprive the present administrative rulings and practice of that Department of the great weight which is given by the judiciary to long-continued and consistent rulings and practice under the so-called "executive construction" rule. Long-continued and consistent administrative rulings and practice are frequently of controlling importance in the determination of questions relating to federal tax matters. They have been accorded judicial recognition in favor of a taxpayer as well as against a taxpayer. An outstanding example of long-continued and consistent rulings and practice being given judicial recognition in favor of the taxpayer is the so-called "patronage dividend exclusion" accorded to cooperatives. Judicial recognition of that exclusion is based largely upon long-continued and consistent administrative rulings and practice. See Farmers Cooperative Co. v. Birmingham, D.C.Iowa 1949, 86 F.Supp. 201, 206, 212. Under the record in this case the defendant Collector could not very well claim and he does not claim that the administrative rulings and practice now in vogue have been either long-continued or consistent.

It is also the contention of the plaintiffs that the previous interpretations, rulings and practice of the Treasury Department in regard to the imposition of the so-called cabaret tax deprive the present interpretations, rulings and practice of that Department of the benefit of the rule of Congressional acquiescence. It has been fairly recently stated by the United States Supreme Court that the rule of Congressional acquiescence has treacherous features. Girouard v. United States, 1946, 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084. Even if that rule were to be regarded as being applicable it would tend to favor the plaintiffs. During the years when the previous administrative rulings and practice were being followed, Congress had the specific statute in question immediately before it for consideration on two occasions in connection with a change in the rate of tax and it might possibly be inferred that if Congress was not in agreement with the administrative rulings and practice as to the nonliability of ballrooms for the so-called cabaret tax imposed by that statute it would have at that time remedied the situation. However, it is the view of the Court that there is not a sufficient foundation for the applicability of the rule as to Congressional acquiescence in favor of the previous administrative rulings and practice and much less so in favor of the present administrative rulings and practice.

■■■ It is well and authoritatively settled that unless the contrary appears statu-

tory words are presumed to be used in their ordinary and usual sense and with the meaning commonly attributable to them. Deputy v. DuPont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416; Old Colony Railroad Co. v. Commissioner, 1932, 284 U. S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484; De Ganay v. Lederer, 1919, 250 U.S. 376, 381, 39 S.Ct. 524, 63 L.Ed. 1042. In the case of Deputy v. DuPont, supra, the United States Supreme Court stated at page 498 of 308 U.S., at page 368 of 60 S.Ct.: "We are dealing with the context of a revenue act and words which have today a well-known meaning. * * * In the absence of clear evidence to the contrary, we assume that Congress has used these words in that sense." It is also well established that a legislative body may be its own lexicographer and write its own definitions of words and terms. Sandberg Co. v. Iowa State Board, 1938, 225 Iowa 103, 107, 278 N. W. 643, 645, 281 N.W. 197; Eysink v. Board of Sup'rs, 1941, 229 Iowa 1240, 296 N.W. 376, 378. If a definition of a word is given in a statute that definition is controlling. Von Weise v. Commissioner, 8 Cir., 1934, 69 F.2d 439, 441. It is the contention of the defendant Collector that Congress did, in the statute under consideration, write its own definition of "cabaret or other similar place" and that that definition includes a ballroom such as operated by the plaintiffs and that such being the case that definition prevails over any meaning ordinarily and generally attributed to those words. The plaintiffs do not contend that Congress has not set forth a definition of "cabaret or other similar place" in the statute in question, but they do contend that that definition does not either expressly or impliedly include within its terms a ballroom such as that operated by them.

As heretofore noted, Congress has included in Section 1700(e) of the Internal Revenue Code a definition of what constitutes a roof garden, cabaret, or other similar place. This same definition has been included in Section 101.14 of Title 26, Regulations 43, CFR, 1949 Ed., 148, which is a portion of the Treasury Department Regulations purporting to interpret Section 1700(e) of the Code. It seems clear that the matter contained in the text of Section 101.14 of Treasury Regulations 43, supra, is substantially the same as that contained in Section 1700(e). The parties are in controversy as to the applicability of Example No. 1 accompanying Section 101.14 and purporting to be interpretive of it. That example, as heretofore noted, is as follows: "*Example* (1). A proprietor of a dancing establishment provides for the serving of refreshments to his patrons. An admission or cover charge is made to each patron. In this case the admission or cover charges and also the charges for refreshment, service, and merchandise are subject to the tax."

It is the contention of the plaintiffs that interpretative Example No. 1 was never meant to apply to ballrooms of the type and kind operated by them. It is the further contention of the plaintiffs that if, as the defendant Collector presently contends, the said example is applicable to ballrooms of the type and kind operated by the plaintiffs then the example constitutes an erroneous interpretation.

It has been heretofore noted that since 1942 and up to and including the present time there has been no change in the wording of Section 1700(e) with the exception of a few minor changes due to a change in the rate of tax, and that from 1942 up to and including the present time there has been no change in the wording of Section 101.14 of Treasury Regulations 43, relating thereto, with the exception of changes in the rate, noted above, and other minor changes not material to any issues in this case. During that same period there has been no change in the wording of interpretative Example No. 1 which accompanies Section 101.14. Because since 1942 and up to and including the present time, the statute, the Regulations issued under it, and interpretative Example No. 1 accompanying the Regulations have remained substantially the same as they were in 1942, the shift by the Treasury Department during the latter part of that period in its administrative rulings and practice from what they had been during the earlier and greater part of that period could not be

attributed to any change in the statute, Regulations, or interpretative Example. It would seem that what has taken place is a change in the interpretation of interpretative Example No. 1. In a recent case it is noted that the interpretation of interpretations is a situation with which the federal courts are familiar. See National Labor Relations Board v. National Maritime Union, 2 Cir., 1949, 175 F.2d 686, 691. The plaintiffs suggest that if by the language contained in interpretative Example No. 1 it was intended to include ballrooms of the type and kind operated by them, for the greater part of the period since 1942 it has been a "paper" interpretation which has not been followed either in administrative rulings or in administrative practice. The contention of the plaintiffs is that the administrative rulings made and the administrative practice followed for a period of years most strongly indicates that the Treasury Department did not regard ballrooms of the type and kind operated by the plaintiffs as coming within the purview of interpretative Example No. 1. The plaintiffs' documentary evidence as to this phase of the case has been heretofore noted. It is a well-recognized rule that the interpretation of a statute by the agency charged with its administration is of great weight in the construction of it. It would also seem that such agency's interpretation of an interpretation might be of similar weight. In the present case apparently there is involved either the situation of two different interpretations or two different interpretations of an interpretation. It would seem that in such a situation the second interpretation is not entitled to be given the same weight by the judiciary as it would have been given if there had not been such variation.

■ The primary rule of statutory construction is to ascertain and give effect to the will and intent of Congress. United States v. N. E. Rosenblum Truck Lines, 1942, 315 U.S. 50, 53, 62 S.Ct. 445, 448, 86 L.Ed. 671; United States v. Windle, 8 Cir., 1946, 158 F.2d 196, 199. The courts have and do make use of a number of well-recognized rules in ascertaining Congressional will and intent. Such rules are aids of an auxiliary character. In certain situations one of those rules alone may be determinative without resort to other rules. For example, in certain situations the courts have ascertained such will and intent by applying only the rule as to administrative interpretation, rulings, and practice. In other situations the courts have ascertained such will and intent by applying only the rule as to legislative history. However, in a greater number of situations the consideration of one rule alone does not present a sufficiently clear legal picture, and in such cases the courts give consideration to a number of apparently applicable rules and from such consideration a clearer legal picture emerges. In the discovery of Congressional intent no one invariable rule is controlling. Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 1945, 150 F.2d 988, 993, 161 A.L.R. 370, certiorari denied 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467.

■ In the present case the application of the rule of executive construction alone leaves in doubt the matter of Congressional will and intent as to the statute in question. It is the view of the Court that such being the situation consideration should be given to other well-known and well-recognized rules made use of by the Courts in determining Congressional will and intent. See Burnet, Commissioner v. Chicago Portrait Co., 1932, 285 U.S. 1, 16, 52 S.Ct. 275, 76 L. Ed. 587; Alexander, Collector v. Cosden Pipe Line Co., 1934, 290 U.S. 484, 497, 498, 54 S.Ct. 292, 78 L.Ed. 452; Red Wing Malting Co. v. Willcuts, Collector, 8 Cir., 1926, 15 F.2d 626, 629, 49 A.L.R. 459, certiorari denied, 1927, 273 U.S. 763, 47 S.Ct. 476, 71 L.Ed. 879. When aid in the construction of the meaning of words used in a statute is available, such aid may be made use of however clear the words may appear upon superficial examination. United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 543-544, 60 S.Ct. 1059, 84 L. Ed. 1345, rehearing denied 311 U.S. 724, 61 S.Ct. 53, 85 L.Ed. 472. The rule as to legislative history has been heretofore referred to and the legislative history as to the particular statute in question has been set out.

Reference has heretofore been made to the rule that in the absence of clear evidence to the contrary it is assumed that Congress intended the words used by it in a statute to have their well-known and well-recognized meanings. Concomitantly thereto, it is to be assumed that Congress intended to be applicable to the words and terms used therein the well-known and well-recognized rules relating to the use of words. Further, it is not to be assumed that Congress consciously indulges in obscurity and circumlocution in the matter of its will and intent. It is well settled that the Courts will construe a statute in conformity with its dominating general purpose and will read text in the light of context. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88.

It would therefore seem necessary in the present case to consider the applicability to the statute and regulations in question of the rule commonly known as the "ejusdem generis" rule, i. e., "of the same kind, class or nature." That rule is to the effect that where in a statute general words follow a designation of particular subjects the meaning of the general words will ordinarily be presumed to be restricted by the words of particular designation. The general words will be regarded as including only things of the same kind, class, character or nature as those specifically enumerated and such words will not be given the wide and comprehensive signification that they would be given if they stood alone. 50 Am. Jur. pp. 244, 245; 28 C.J.S., pages 1049–1050. The rule has been applied in construing provisions of the Internal Revenue Code imposing excise taxes. White, Collector v. Aronson, 1937, 302 U.S. 16, 20, 58 S.Ct. 95, 82 L.Ed. 20; United States v. Phez Co., 9 Cir., 1928, 28 F.2d 106, 107; Feitler v. Harrison, 7 Cir., 1942, 126 F.2d 449, 451. In all three of the above-cited cases it was held that the particular designation in the statute of the articles subject to the excise tax followed by general words of designation brought into the list of taxables only those articles which were similar to those particularly named and with which they were closely associated. The rule of ejusdem generis is to be used as an aid in ascertaining the true intention of a statute and not to thwart it. United States v. Gilliland, 1941, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598. The rule serves to prevent general words from extending their operations into a field not intended. Phillips v. Houston Nat. Bank, 5 Cir., 1940, 108 F.2d 934, 936. The rule of ejusdem generis is the specific application of the broader rule known as "noscitur a sociis," i.e., "it is known from its associates." See Eastman v. Armstrong-Byrd Music Co., 8 Cir., 1914, 212 F. 662, 667, 52 L.R.A.,N.S. 108. That rule is also sometimes referred to as the rule that, "words are known by the company they keep." The rule of noscitur a sociis is to the effect that the meaning of doubtful words may be ascertained by reference to the meanings of words associated with them. Application of Central Airlines, Inc., 1947, 199 Okl. 300, 185 P.2d 919, 924. See also 46 C.J. Note 33, p. 496. The rule of noscitur a sociis has long been recognized by the United States Supreme Court. Neal v. Clark, 1877, 95 U.S. 704, 709, 24 L.Ed. 586; United States v. Ryan, 1931, 284 U.S. 167, 175–176, 52 S.Ct. 65, 76 L.Ed. 224. Sometimes the terms "ejusdem generis" and "noscitur a sociis" are used interchangeably. As stated above, however, the maxim noscitur a sociis is broader than the ejusdem generis rule; the latter rule being a specific application or illustration of the former. Evans v. City of Jackson, 1947, 202 Miss. 9, 30 So.2d 315, 317; Misch v. Russell, 1891, 136 Ill. 22, 25, 26 N. E. 528, 529, 12 L.R.A. 125. It would seem that under the rule of ejusdem generis consideration is given largely to the color and meaning to be given to general words which are immediately or closely associated in a sentence with more specific words while under the rule of noscitur a sociis a broader association is encompassed. Under that rule general words of doubtful meaning are given color and meaning from the entire statutory setting and environment of which they are a part.

Although Section 1700(e) of the Internal Revenue Code and Sections 101.13 and

101.14 of Title 26, Treasury Regulations 43 have been heretofore discussed at considerable length, a detailed comparison of the language of the statutory Section 1700(e) with the language of the corresponding Treasury Regulations would seem to be of value. Accordingly Section 1700(e) and those portions of the Regulations which correspond to it and which have to do with matters under consideration in the present case are set forth below in parallel columns:

"Section 1700(e) Tax on cabarets, roof gardens, etc.—

"(1) Rate.

"A tax equivalent to 5 per centum (Section 1650 of the Internal Revenue Code makes the rate 20 per cent) of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance. No tax shall be applicable under subsection (a) (1) on account of an amount paid with respect to which tax is imposed under this subsection.

"(2) By whom paid.

"The tax imposed under paragraph (1) shall be returned and paid by the person receiving such payments."

"Roof Gardens, Cabarets, or Similar Entertainments.

"§ 101.13 Basis, rate, and computation of tax. (a) The tax imposed by section 1700(e), as amended, applies to all amounts paid for admission, refreshment, service, *and* merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The tax is at the rate of 20 per cent of the total amounts so paid."

"§ 101.14 Scope of tax. (a) The term 'roof garden, cabaret, or other similar place' includes [2] any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. A *public* performance *furnished at a roof garden, cabaret, or other similar place* shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance."

---

**2.** The corresponding term in the statute appears in the words, "shall include."

This variation does not appear of legal significance.

There is very little variation in the language used in the statute and in the language used in paragraph (a) of Section 101.13 and paragraph (a) of Section 101.14. The words italicized in the Sections of the Regulations set out above indicate those words which appear in the portions of the Regulations quoted which do not appear in Section 1700(e). The variations would not appear to be of significance. Since paragraph (a) of Section 101.13 and paragraph (a) of Section 101.14 for all practical purposes merely follow the language of the statute they are not of assistance in construing the statute and if the language used in the statute is ambiguous then the same language used in those portions of the Regulations is also ambiguous. Therefore whatever rules of construction would be applied to such terms in the statute would also be applied to the same terms when used in those portions of the Regulations referred to. However, paragraph (b) of Section 101.14 does not follow the identical language of the statute. That paragraph reads as follows: "(b) Where music, whether by an orchestra, a mechanical device, or otherwise, and a space in which the patrons may dance is furnished in the dining room of a hotel, or in a restaurant, bar, etc., the entertainment constitutes a public performance for profit at a roof garden, cabaret, or similar place, and the payments made for admission, refreshment, service, and merchandise are subject to the tax."

In paragraph (b) of Section 101.14, set out above, the words "and a space in which the patrons may dance is furnished" are used, while in the statute and in paragraph (a) of the same Section the words "any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment * * * are afforded" are used. It would seem that this change in wording is of no particular assistance in construing the statute. In paragraph (b) in connection with the definition of a public performance for profit at a roof garden, cabaret or similar place the words "in the dining room of a hotel, or in restaurant, bar, etc." are used. In the statute and in paragraph (a) of Section 101.14 the words, "any room in any hotel, restau-

rant, hall" are used. This difference in language between paragraph (b) on the one hand and paragraph (a) and the statute on the other arises because paragraph (b) apparently has to do with the specific hotel dining room or bar situation, whereas paragraph (a) has to do with public performances more generally and deals with a wider category of entertainment establishments. Therefore the words in paragraph (b), "the dining room of a hotel, restaurant, bar, etc.," are not of especial significance when contrasted with the words of paragraph (a) and the statute, "any room in any hotel, restaurant, hall" because the two paragraphs were apparently meant to apply to different situations. It should be noted that paragraph (b) of Section 101.14 was added to the Regulations in 1941 at the time the Treasury Department was attempting to impose the so-called cabaret tax upon hotel dining rooms of the type and kind involved in the cases of United States v. Broadmoor Hotel, supra, and Busey v. Deshler Hotel Co., supra.

It should be noted that neither in the statute nor in the portions of the Regulations referred to do the words "ballroom" or "dance hall" appear. That has been true since the statute was first enacted in 1917. In Section 1700(e) and in paragraph (a) of Section 101.14 the words "roof garden" and "cabaret" are followed by the words "other similar place." In paragraph (b) of the same Section of the Regulations those words are followed by the words "similar place." The difference would not appear to be of legal significance. In paragraph (b) of Section 101.14 the words "in the dining room of a hotel, or in a restaurant, bar," are followed by the word "etc." In Black's Law Dictionary, 3d Ed., 1933, it is stated that "etc.," which is the abbreviated form of et cetera, means "and others;" "and others of the like kind;" "and so forth," and is frequently affixed as an abbreviation to a clause already given in full for the sake of convenience. The abbreviation "etc." ordinarily refers to others of the like kind and is used to point out that other things which could be mentioned are to be understood. Osterberg v. Section 30 Development Co., 1924, 160 Minn. 497, 200 N.W. 738. It is a

term which is somewhat indefinite in character. Forman v. Columbia Theater Co., 1944, 20 Wash.2d 685, 148 P.2d 951, 953. When the term is used following things particularly named it means other things of like kind. Hisaw v. Ellison Ridge Consolidated School Dist., 1940, 189 Miss. 664, 198 So. 557, 558. It should be noted that in each instance in which the words "other similar place," "similar place," "etc.," are used in either the statute or in the Regulations they are preceded by an enumeration or designation of particular places. The Court is of the view that there is doubt as to what was intended to be included by the use of these general words. In the situation thus presented the maxim of noscitur a sociis and more particularly the specific application of that maxim in the rule of ejusdem generis would be applicable. In addition to those rules, the other rules of statutory construction heretofore noted and other pertinent matters should be given consideration in determining Congressional intent in connection with the words used in the statute in question.

One matter to which the parties devoted a portion of their argument was as to the meaning of the words in the statute and Regulations, "music and dancing privileges * * * are afforded * * * in connection with the serving or selling of * * * refreshments." It is the contention of the plaintiffs that while the operators of cabarets stress the items of food and drinks and the patrons of such establishments are obligated to purchase such items as a prerequisite to availing themselves of dancing privileges, the serving and selling of refreshments in the plaintiffs' ballroom was merely incidental to the dancing privilege. They stated in argument that it could not any more be said that dancing in their ballroom is furnished in connection with the sale of popcorn, candy, gum, peanuts and soft drinks than it could be said that patrons of movie houses are furnished a movie in connection with the sale of popcorn, or that patrons of roller skating rinks are furnished roller skating privileges in connection with the sale of popcorn and similar items. The plaintiffs in that connection also claim that the use of the words

"afforded" or "furnished" limit the application of the clause in question to those establishments where the right to dance arises only because of the purchase of refreshments. The defendant Collector's position in this respect is that the words "afforded" and "furnished" are not mandatory words but merely relate to having refreshments available for sale. However, under the statute it is only those establishments which fall within the category of "roof garden, cabaret or other similar place" to which the provision as to the serving or selling of refreshments relates, so that the question of determinative importance is whether a ballroom of the type and kind operated by the plaintiffs falls within that category of entertainment establishment.

Another matter to which the parties devoted a portion of their arguments was as to what constitutes a "public performance for profit" within the meaning of the statute. The plaintiffs called attention to the evidence introduced by them showing that for a number of years the administrative rulings were to the effect that the operator of a ballroom was not furnishing "a public performance." The statute and the administrative rulings referred to make it clear that the furnishing of instrumental or mechanical music alone does not constitute a "public performance" under the provisions of the statute. The question then suggests itself as to what constitutes the "performance" in a ballroom of the type and kind operated by the plaintiffs where the only entertainment apart from the dance music is dancing by the patrons themsevles. The plaintiffs assert that the usual and ordinary patron of a ballroom or a dance hall, participating in the dancing, does not regard himself as putting on a performance. They also assert that the situation of dance hall patrons is similar to that of the patrons of a roller skating rink where music is furnished, and that such patrons likewise would not ordinarily regard their participation in roller skating as constituting a performance. The defendant Collector suggests the possibility that a number of ballroom patrons might sit around and watch the dancing without participating in it. The plaintiffs controvert

the suggestion that any significant number of ballroom patrons do not participate in the dancing. That suggestion of the defendant Collector is without support in the record so far as the plaintiffs' ballroom is concerned. The testimony of the witnesses was to the effect that the extent to which ballroom patrons in general do not avail themselves of dancing privileges was at best a matter of conjecture, and that in any event the number of such nonparticipants was negligible. This Court cannot take judicial notice that any significant number of ballroom patrons do not avail themselves of the dancing privileges. In Wigmore on Evidence, 3d Ed., Sec. 2567, it is stated, "That a matter is judicially noticed means merely that it is taken as true without the offering of evidence by the party who should ordinarily have done so." The matter of whether any significant number of ballroom patrons do not avail themselves of dancing privileges is a matter of controversy. Courts are very cautious in the matter of taking judicial notice of matters which apparently are the proper subject of controversy. Such policy avoids the possibility of judicial notice not being in accord with the facts. It should be noted that in order to create liability for the tax imposed by Section 1700(e) there must be a public performance; the performance must be for profit, and the performance must be in a roof garden, cabaret or other similar place. The requirements of a public performance and a performance for profit are only two of these several requirements. No determination as to whether these latter two requirements have been met in a particular case is necessary unless the establishment falls within the category of the type and kind defined in the statute. The defendant Collector contends that ballrooms of the type and kind operated by the plaintiffs do fall within that category. In support of that contention he most strongly relies upon the case of Avalon Amusement Corporation v. United States, 7 Cir., 1948, 165 F.2d 653. The facts in that case as set forth by the Court, 165 F.2d on page 654, are as follows: "The plaintiff operates a public dance hall in La Crosse, Wisconsin, for which an admission charge is paid by the public patrons. The plaintiff also charges for the checkroom service. Music is furnished by an orchestra provided by the plaintiff, to which music the patrons dance. No other form of entertainment is provided by the plaintiff. No meals or sandwiches are served. In a room adjacent to and opening off the dance floor the plaintiff operates for the benefit of its dance patrons a bar where beer, soft drinks, and confections are sold. Near the bar, at the end of the dance hall, the plaintiff provides booths, and at another location there are tables and chairs at which the dance patrons may be seated and served refreshments from the bar. When not used as a dance hall, the hall is sometimes rented by the plaintiff to individuals or groups for boxing and wrestling matches and other forms of entertainment."

In 1946 the Government assessed the so-called cabaret tax imposed by Section 1700(e) upon the receipts which the plaintiff in the Avalon case derived from the checkroom referred to. The District Court held that the plaintiff's dance hall and the receipts from the checkroom service operated in connection therewith were within the provisions of said Section 1700(e) and rendered judgment accordingly. That judgment was affirmed by the United States Court of Appeals for the Seventh Circuit in the case of Avalon Amusement Corporation v. United States, supra. The case was tried upon an agreed statement of facts. The findings of fact and the conclusions of law of the District Court, based upon the agreed statement of facts, appear in 73 F.Supp. 328. The plaintiffs in the present case introduced into evidence the brief and argument filed by the Government with the United States Court of Appeals for the Seventh Circuit on the appeal of the Avalon case. It is the contention of the plaintiffs that the findings of fact and conclusions of law of the District Court together with the brief and argument of the Government on appeal indicate that the over-all picture that the United States Court of Appeals had before it on the appeal in the Avalon case is not the same as the over-all picture presented by the record in this case. The plaintiffs claim that the

record in this case is much more complete and detailed and in several respects dissimilar from the record in the Avalon case. It might be noted that the establishment in question in the Avalon case had a bar and served beer in addition to soft drinks and confections. As heretofore noted, the plaintiffs did not have a bar for the selling of beer and did not sell beer. Paragraph (b) of Section 101.14, heretofore set forth, specifically includes a "bar" as being within the category subject to tax under the provisions of Section 1700(e). It might be claimed the presence of a bar for the selling of beer would place an establishment within the category of a "bar" within the scope of the Regulation referred to. However, since the United States Court of Appeals for the Seventh Circuit in the Avalon case did not refer to that feature in connection with the Regulations, it is believed that the absence of a bar for the selling of beer from the plaintiffs' establishment and the presence of such a bar in the establishment under consideration in the Avalon case is not determinative. In the establishment under consideration in the Avalon case tables in addition to booths were furnished, while in the case of the plaintiffs' ballroom only booths were furnished. It is believed that such variation is not of legal significance. There are, however, apparent important differences between the picture presented in the Avalon case and the picture presented in the present case. In the present case a large amount of evidence was introduced as to the well-known and well-recognized meaning of the word "cabaret" and the characteristics which distinguish "cabarets" from "ballrooms" of the type and kind operated by the plaintiffs. In the Avalon case there is nothing to indicate that any such evidence was presented. In the Avalon case the legislative history as given in the Government's brief and argument on appeal went back only to 1942. In the present case a full, complete, legislative history of the statute in question since its original enactment in 1917 was presented. In the Avalon case the attention of the United States Court of Appeals for the Seventh Circuit was called to what was claimed to be the then-existing interpretation of the statute.

The attention of that Court was apparently not called to the fact that the administrative rulings and practice of the Treasury Department had for several years been contrary to the claimed interpretation.

The important question to be determined in the present case is whether Congress intended to subject the receipts of ballrooms to the so-called cabaret tax imposed by the provisions of Section 1700(e) of the Internal Revenue Code, supra.

It is clearly and satisfactorily established by the record in this case that the words "cabaret" and "roof garden" in their commonly-known and generally-understood sense have not referred and do not refer to or describe a ballroom of the type and kind operated by the plaintiffs. It is further clearly and satisfactorily established that ballrooms are amusement establishments of a class and type which are separate, distinct, and dissimilar from "cabarets" and "roof gardens" and that they have been and are so commonly and generally regarded. The legislative history of the statute in question indicates Congress used the words "cabaret" and "roof garden" in their commonly-known and well-understood meaning and did not regard ballrooms of the type and kind operated by the plaintiffs as being of the same or similar type, kind, or class as those establishments encompassed by the words "cabaret" and "roof garden." It also seems clear that under the well-recognized rules of statutory construction heretofore discussed, the words, terms, and language contained in Section 1700(e) should not be construed as including ballrooms of the type and kind operated by the plaintiffs.

If Congress had intended by Section 1700(e) to include ballrooms it would have been a simple matter to have added the word "ballroom" to the enumeration of the establishments subject to the tax. If Congress, by the language it did use, intended to include ballrooms within the scope of Section 1700(e), it took a very circuitous and long way around a very low legislative wall.

It is the view of the Court that it was not the will and intent of Congress that receipts

230

from ballrooms of the type and kind operated by the plaintiffs were to be subject to the tax imposed by Section 1700(e).

It is the holding of the Court that the defendant Collector in collecting from the plaintiffs the sum of $44.90 based upon the receipts from their ballroom for the evening of December 9, 1948, as and for a tax imposed thereon by said Section 1700(e) acted erroneously and illegally.

It is ordered that judgment be entered in favor of the plaintiffs in the sum of $44.90 with interest and costs as provided by law.